NOVEMBER 21, 1973

No. A–435. LIFE OF THE LAND ET AL. v. BRINEGAR, SECRETARY OF TRANSPORTATION, ET AL. C. A. 9th Cir. Motions of the State of Hawaii and of Kalihi-Palama

Community Council et al. to vacate stay and injunction entered by MR. JUSTICE DOUGLAS on November 7, 1973, granted.

MR. JUSTICE DOUGLAS, dissenting.

This case involves the sufficiency and objectivity of an Environmental Impact Statement (EIS) prepared in connection with the construction of the Reef Runway Project at Honolulu International Airport. The project is a 12,000-foot runway to be built offshore on filled reef-land in the Keehi Lagoon. The construction will involve the dredging of some 14 million cubic yards of coral and silt, consuming over 1,200 acres of ocean coral reef. The EIS, required by the National Environmental Policy Act of 1969,[1] was prepared in this case as a "joint project" by the Federal Aviation Agency, the State of Hawaii, and the Ralph M. Parsons Company.[2] The problem, as the Court of Appeals noted, is that Parsons is a private firm under contract to render management consulting services for the project in the event it is approved and thus has a strong "financial interest in an affirmative decision on the proposed project." 485 F. 2d 460, 467 (CA9 1973). The court, however, found nothing "in either the wording of NEPA or the case law which indicates that, as a matter of law, a firm with a financial interest in the project may not assist with the drafting of the EIS." *Ibid.*

It seems to me a total frustration of the entire purpose of NEPA to entrust evaluation of the environmental factors to a firm with a multimillion-dollar stake in the

---

[1] 83 Stat. 852, 42 U. S. C. § 4321 *et seq.*

[2] As the court below notes: "[A]n employee of Parsons testified as to the active involvement of the Federal Aviation Agency in the EIS preparation process. The Parsons employee concluded that the EIS 'was more or less a joint effort by Parsons, the State and the F. A. A.'" 485 F. 2d 460, 467 (CA9 1973).

approval of this project. NEPA embodies the belated national recognition that we have been "brought to the brink" by myopic pursuit of technological progress and by a decisionmaking mechanism resting largely on the advice of vested-interest groups.[3] A longstanding policy of listening only to those with enough money to be heard has left our country scarred with a continuum of environmental abscesses. The oil-auto-concrete interests have long urged the necessity of paving over the countryside with highways. The same oil interests which argued the advisability of offshore drilling at Santa Barbara pressed for a trans-Alaska pipeline and obtained a concession in the Trans-Alaska Pipeline Authorization Act that in effect exempted the pipeline from NEPA to the extent that it curtailed judicial review.[4] Other inter-

---

[3] "There may be controversy over how close to the brink we stand, but there is none that we are in serious trouble." H. R. Rep. No. 91–378, p. 4 (1969).

"By land, sea, and air, the enemies of man's survival relentlessly press their attack. The most dangerous of all these enemies is man's own undirected technology. The radioactive poisons from nuclear tests, the runoff into rivers of nitrogen fertilizers, the smog from automobiles, the pesticides in the food chains, and the destruction of topsoil by strip mining are examples of the failure to foresee and control the untoward consequences of modern technology." N. Y. Times, May 3, 1969, p. 34, col. 2, quoted in H. R. Rep. No. 91–378, *supra*, at 3.

[4] Section 203 (d) of the Act, 87 Stat. 585, 43 U. S. C. § 1652 (d) (1970 ed., Supp. III), provides in part:

"The actions taken pursuant to this title which relate to the construction and completion of the pipeline system, and to the applications filed in connection therewith necessary to the pipeline's operation at full capacity, as described in the Final Environmental Impact Statement of the Department of the Interior, shall be taken without further action under the National Environmental Policy Act of 1969; and the actions of the Federal officers concerning the issuance of the necessary rights-of-way, permits, leases, and other authorizations for construction and initial operation at full capacity of said pipeline system shall not be subject to judicial

ests, notably those waiting for the great "killing" in nuclear fission, got temporary relief from NEPA.[5] Our congested land and fouled air bear grim testimony to the success of Detroit in making fortunes out of the destruction of elemental parts of our biosphere.

We have listened as the manufacturing-industrial complex advised us on the desirability of fueling "progress" by stripping our land and using our rivers, lakes, and atmosphere as technological sewers. We have allowed commercial recreational interests to determine the advisability of "developing" our dwindling wilderness.[6] NEPA was designed to correct in part the infor-

review under any law except that claims alleging the invalidity of this section may be brought within sixty days following its enactment, and claims alleging that an action will deny rights under the Constitution of the United States, or that the action is beyond the scope of authority conferred by this title, may be brought within sixty days following the date of such action. A claim shall be barred unless a complaint is filed within the time specified."

[5] Volume 86 Stat. 191, 42 U. S. C. § 2242 (1970 ed., Supp. II), an amendment of the Atomic Energy Act of 1954, grants the Atomic Energy Commission the authority to issue temporary operating licenses for nuclear power reactors and provides that, under certain conditions, reactor operation may begin before environmental impact studies pertinent to full-term operation have been completed. See The AEC Amendment: Temporary Licensing of Nuclear Reactors, 10 Harv. J. Legis. 236 (1973).

The recent Pugwash Conference held in Finland August 30–September 4, 1973, which included 100 scientists (20 each from the United States and USSR), reported as follows on nuclear energy:

"The as yet unsolved problem of waste management and the possibly unsolvable (in an absolute sense) problems of catastrophic releases of radioactivity and diversion of bomb-grade material, combine to create grave and justified misgivings about the vast increase in the use of nuclear power that has been widely predicted. The wisdom of such an increase must at the present time be seriously questioned." 17 Cong. Rec. S18727 (Oct. 8, 1973).

[6] See, e. g., the extensive skiing development of the Mineral King Valley in Sequoia National Forest. Sierra Club v. Morton, 405 U. S. 727 (1972).

mation void underlying our national decisionmaking mechanism. Congress knew what happens when we heed the counsel only of those who measure national advancement by GNP and the Dow Jones industrial average. Congress knew that we can trust them to supply us with voluminous economic data, but it also knew that we cannot trust them to supply us with an improved quality of life. They are not advocates of the interests of mountains, forests, streams, rivers, oceans, and coral beds, or of the wildlife that inhabit them, or the people who enjoy them. They are not useful when it comes to appraising the values of an unspoiled meadow or glacier or reef, for they think only in terms of dollars. They lack the sensitivity to be entrusted with evaluating what effect dredging will have on our estuaries. These estuaries are essential in part of the life cycle of two-thirds of the marine life. Dredging makes these estuaries biological deserts for years to come. Congress knew that the final say on these environmental matters should not be under the direct or indirect control of those who plan to make millions out of their destruction.

The people have long heard and too long heeded the advice of those with a monetary stake. NEPA was designed to augment that information with an analysis of other factors. Whether that analysis can be undertaken by those whose economic voice is already heard is an issue as yet undecided in this Court.[7] It is an issue worthy of our determination and should be decided before the ongoing construction of the Reef Runway does irreparable injury to the environmental interests here

---

[7] Congress noted in enacting NEPA that "[a]n *independent* review of the interrelated problems associated with environmental quality is of critical importance if we are to reverse what seems to be a clear and intensifying trend toward environmental degradation." H. R. Rep. No. 91–378, p. 3 (1969) (emphasis added).

involved. These are the considerations that led me to grant the stay. I would maintain the status quo until the termination of this litigation.