# WARM SPRINGS DAM TASK FORCE ET AL. *v.* GRIBBLE

No. A–1146.   Decided June 17, 1974

MR. JUSTICE DOUGLAS, Circuit Justice.

Applicants brought an action on March 22, 1974, in the United States District Court for the Northern District of California and sought a preliminary injunction to halt further construction in connection with the Warm Springs Dam-Lake Sonoma Project on Dry and Warm Springs Creeks in the Russian River Basin, Sonoma County, California.   The applicants alleged, *inter alia,* that the Environmental Impact Statement filed by the Army Corps of Engineers concerning the project did not comply with the requirements of the National Environmental Policy Act of 1969, 42 U. S. C. § 4321 *et seq.*

A hearing was held in the District Court on the motion for a preliminary injunction.   On May 23, 1974, the Dis-

trict Court rendered an oral ruling denying applicants' motion for the injunction.[1] A written opinion was filed thereafter. Applicants filed an application in the Court of Appeals for the Ninth Circuit for an injunction pending appeal, which was denied on May 24, 1974.

Application was then made to me as Circuit Justice for the Ninth Circuit seeking a stay of the order of the District Court as well as a stay restraining further construction work on the Warm Springs Dam Project. Because of the seriousness of the claims made by the applicants, I issued an order, on May 30, 1974, staying further disturbance of the soil in connection with the dam (other than research, investigation, planning and design activity) "pending reconsideration of the application when the memoranda of the Solicitor General and the Environmental Protection Agency are received."

A response has been filed, along with further materials submitted by the applicants supporting their request for a stay. After consideration of these submissions, I have entered an order continuing my earlier stay order pending disposition of the appeal in this case by the Court of Appeals for the Ninth Circuit.

The Warm Springs Dam will be an earth-fill dam, holding back a reservoir of water, across Dry Creek, a major tributary of the Russian River in Sonoma County. The dam was first authorized, in smaller form than is now contemplated, in the Flood Control Act of 1962, Pub. L. 87–874, 76 Stat. 1173, 1192. On January 1, 1970, the National Environmental Policy Act, which requires the filing of an Environmental Impact Statement (EIS) for major federal actions significantly affecting the quality of the human environment, 42 U. S. C. § 4332 (2)(C),

---

[1] The order did prohibit respondents from disturbing certain archaeological sites pending compliance with Executive Order 11593, 36 Fed. Reg. 8921, 3 CFR 154 (1971 Comp.).

became law. A draft EIS was not distributed until June 1973, and the final EIS was not filed with the Council on Environmental Quality until December 4, 1973. I am informed that approximately $35 million has been expended on the project already, and that another $7 million will be expended before this case will be heard and determined by the Court of Appeals.

The applicants for this stay focus on two extremely serious challenges to the adequacy of the EIS.

*First,* they note that the dam will sit atop a geologic fault running along Dry Creek. There are other faults nearby. A town of 5,000 people is nestled below the dam and the wall of water it will restrain. At the District Court hearing on applicants' motion for a preliminary injunction, substantial questions were raised about the integrity of the dam should an earthquake occur. There seems to be a recognized "credibility gap" as to the safety of the project; recommendations were received by the Corps from its own staff for further study; and reservations about the safety factor were expressed by the State of California. A contract has been made for further dynamic analysis of the safety of the dam. Should that analysis indicate that the dam is potentially risky, the Corps would have "no choice" but to consider abandoning the entire project. Tr. 1828–1829, 1832.

*Second,* challenges were made at the hearing to the adequacy of the EIS regarding expected poisoning of water in the reservoir behind the dam. The water will be used by consumers in the surrounding county. There were allegations at the hearing that the waters will be poisoned by mercury carried from an abandoned mercury mine which will be inundated when the dam is built, and that asbestos, fluoride, and boron particles will also leach into the waters. It is contended that the EIS is deficient in its treatment of these significant environmental effects.

The District Court rejected these contentions, finding that the Corps adequately dealt with the seismic problem and the water-poisoning problem. It found the EIS adequate. The Solicitor General argues that the District Court's findings are not "clearly erroneous" and will be upheld by the Court of Appeals, and that therefore I should deny the requested stay.

Here, however, the views of the two federal agencies most intimately familiar with environmental issues and the requirements of the National Environmental Policy Act have been filed with the Court. They undermine the determination of the District Court.

The Environmental Protection Agency (EPA) has written to the Solicitor General expressing some doubt about the treatment of the water-poisoning issues in the final EIS.[2] The EPA goes on to say, however, that:

"We wish to emphasize that the CEQ [Council on

[2] "[C]ertain water quality related issues, which potentially impact the environment and which were not analyzed in the final environmental impact statement, came to light during the hearing on plaintiffs' motion for a preliminary injunction. These issues include potential contamination of the reservoir water by boron and fluoride concentrations in the streams which would feed the reservoir and by asbestos concentrations in the serpentine rock underlying the reservoir site. Moreover, with respect to mercury contamination, we understand from a hasty and admittedly incomplete reading of the transcripts of the hearing and the affidavits submitted, that the Corps has agreed to perform pre-inundation studies to predict the biomagnification effect of mercury concentrations in sediments and algae in the reservoir site.

"We believe that the foregoing issues should have been raised and should have been discussed in the final impact statement. We cannot say, however, because we were not present during the proceedings and have not had sufficient opportunity to review the evidence, that these issues would, at the same time, have caused EPA to express environmental reservations as to the construction of the project, within the context of our own NEPA review procedures." Letter of June 4, 1974, from Alan G. Kirk II, Assistant Administrator

Environmental Quality] is the Executive Office charged with NEPA administration and ultimately with evaluating the performance of Federal agencies in complying with the Act. We understand that the Council has expressed concern over the adequacy of the final environmental statement on the Warm Springs project and the issues raised by the Council clearly fall under its administrative responsibilities relative to NEPA." Letter of June 4, 1974, from Alan G. Kirk II, Assistant Administrator for Enforcement and General Counsel, Environmental Protection Agency, to Robert H. Bork, Solicitor General.

The applicants have filed with this Court a letter from the General Counsel of the CEQ to the Solicitor General expressing the views of the Council on the adequacy of the Warm Springs Dam final EIS. Letter of June 11, 1974, from Gary Widman, General Counsel, Council on Environmental Quality, to Robert H. Bork, Solicitor General. In that letter, the Council expresses the view that the plaintiffs and the public are likely to be irreparably harmed if an injunction pending appeal is denied. The Council continues:

"It is the Council's position that the best interests of the Government would be served by halting construction work (excluding environment study and testing) until the appeal is decided on the merits.

"In its letter of February 14, 1974, the Council advised the Corps that its Environmental Impact Statement ('EIS') was not adequate in several respects. The Council asked for further study and consideration of the earthquake hazard, the problems of stimulating population growth in the area,

for Enforcement and General Counsel, Environmental Protection Agency, to Robert H. Bork, Solicitor General.

the calculation of benefits and costs, and further asked consideration of an alternative project (enlargement of the existing Coyote Dam) that would not raise similar environmental problems. The letter asked the Corps to delay action on the project until such further study and consideration was completed.

"Information revealed at trial strongly reinforced our original reservations about the seismic and other problems, and raised new concerns over potential hazards created by chemicals in the water, and in the fish. In its letter to you, the EPA now agrees that the project's adverse environmental effects were not adequately raised or discussed in the EIS. The alternative projects (one of which was mentioned in our letter of February 14) have apparently not received the further study which we suggested. Therefore, if asked, CEQ would reaffirm its original advice to the Corps, that sound policy would require construction work on this project to be halted, pending further analysis of the problems and consideration of available alternatives."

The Council goes on to express in more detail its reasons for concluding that the EIS is deficient:

"At the hearing in the District Court, plaintiffs questioned highly responsible experts, including one originally retained by the Corps, and others who were associated with State and Federal Government agencies who testified to professional reservations about the hazards that could be created by the dam. . . .

. . . . .

"Upholding the District Court's finding of adequacy of the statement, and the Court's approval of the Corps decision to proceed, will permit construction

of a dam in the face of statements by responsible experts that the EIS information is insufficient to answer problems of earthquake hazards created by a fault underlying the dam, and water quality hazards raised by the presence of mercury, boron, fluoride and asbestos in the site area (all of which may be carried into reservoir water by underlying hot springs). Whatever disagreement there may have been on this issue of adequacy of information, the Corps nevertheless stated during and after the hearing that there would be additional studies on the issues of seismicity, water quality and archaeology, and it recognized that the results of those studies may lead to a conclusion that the dam should not be built."

The Council cites numerous ways in which the Warm Springs EIS may flout Council guidelines, including lack of research and analysis supporting its conclusions and lack of presentation of responsible opposing scientific opinion and of critical comments by responsible governmental agencies. It is the view of the CEQ that denial of an injunction could further jeopardize the possibility of obtaining objective agency choice between alternative projects should an appellate court overturn the decision of the District Court,[3] that further construction could

---

[3] See *Power Reactor Co.* v. *Electricians*, 367 U. S. 396, 417 (DOUG-LAS, J., dissenting):

"But when that point is reached, when millions have been invested, the momentum is on the side of the applicant, not on the side of the public. The momentum is not only generated by the desire to salvage an investment. No agency wants to be the architect of a 'white elephant.'"

See also *Arlington Coalition on Transportation* v. *Volpe*, 458 F. 2d 1323, 1333 (CA4 1972):

"Further investment of time, effort, or money in the proposed route would make alteration or abandonment of the route increasingly

impair the freedom of choice of local voters who will be considering the project, and that "it is both contrary to law and an irreparable detriment to plaintiffs and the public to permit the construction to proceed in such circumstances."

The mandate of the National Environmental Policy Act regarding Environmental Impact Statements is stated in the Senate Report:

"(c) Each agency which proposes any major actions, such as project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs, shall make a determination as to whether the proposal would have a significant effect upon the quality of the human environment. If the proposal is considered to have such an effect, then the recommendation or report supporting the proposal must include statements by the responsible official of certain findings as follows:

"(i) A finding shall be made that the environmental impact of the proposed action has been studied and that the results of the studies have been given consideration in the decisions leading to the proposal.

"(ii) Wherever adverse environmental effects are found to be involved, a finding must be made that those effects cannot be avoided by following reasonable alternatives which will achieve the intended purposes of the proposal. Furthermore, a finding

---

less wise and, therefore, increasingly unlikely. If investment in the proposed route were to continue prior to and during the Secretary's consideration of the environmental report, the options open to the Secretary would diminish, and at some point his consideration would become a meaningless formality."

must be made that the action leading to the adverse environmental effects is justified by other considerations of national policy and those other considerations must be stated in the finding.

"(iii) Wherever local, short-term uses of the resources of man's environment are being proposed, a finding must be made that such uses are consistent with the maintenance and enhancement of the long-term productivity of the environment.

"(iv) Wherever proposals involve significant commitments of resources and those commitments are irreversible and irretrievable under conditions of known technology and reasonable economics, a finding must be made that such commitments are warranted." S. Rep. No. 91–296, pp. 20–21 (1969).

The tendency has been to downgrade this mandate of Congress, to use shortcuts to the desired end, and to present impact statements after a project has been started, when there is already such momentum that it is difficult to stop. There are even cases where the statement is not prepared by a Government agency but by a contractor who expects to profit from a project.[4] One hesitates to interfere once a project is started, but if the congressional mandate is to be meaningful it must be done here.

As the EPA observed, the CEQ is the Executive Office charged with administration of the National Environmental Policy Act (NEPA) and the Environmental Impact Statements. The NEPA requires all federal agencies both to consult with the CEQ to insure that environmental factors are adequately considered and to assist

---

[4] See *Life of the Land* v. *Brinegar*, 414 U. S. 1052; *Power Reactor Co.* v. *Electricians*, 367 U. S. 396.

the CEQ. 42 U. S. C. §§ 4332 (2)(B) and (H). The CEQ is given the authority under NEPA to

"review and appraise the various programs and activities of the Federal Government in the light of the policy set forth in subchapter I of this chapter [which includes the EIS requirement] for the purpose of determining the extent to which such programs and activities are contributing to the achievement of such policy, and to make recommendations to the President with respect thereto." 42 U. S. C. § 4344 (3).

The Council's members must be qualified "to appraise programs and activities of the Federal Government in the light of the policy" set forth in subchapter I of the Act. 42 U. S. C. § 4342.

The Council, ultimately responsible for administration of the NEPA and most familiar with its requirements for Environmental Impact Statements, has taken the unequivocal position that the statement in this case is deficient, despite the contrary conclusions of the District Court. That agency determination is entitled to great weight, see, *e. g.*, *Trafficante* v. *Metropolitan Life Ins.*, 409 U. S. 205, 210; *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 433–434; *Udall* v. *Tallman*, 380 U. S. 1, 16, and it leads me to grant the requested stay pending appeal in the Court of Appeals to maintain the status quo in the construction of the Warm Springs Dam.