STATE OF ALASKA, Plaintiff,

v.

James Earl CARTER, President of the United States, in his Individual capacity, Cecil D. Andrus, Secretary of the Interior, in his Individual capacity, et al., Defendants.

Civ. No. A78–291.

United States District Court,
D. Alaska.

Nov. 27, 1978.

Thomas E. Meacham, Asst. Atty. Gen., State of Alaska Dept. of Law, Anchorage, Alaska, for plaintiff.

Alexander O. Bryner, U. S. Atty. for Alaska, Anchorage, Alaska, for defendants.

## MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

THIS CAUSE comes before the court on the State of Alaska's motion for a preliminary injunction enjoining the defendants from closing the comment period on a draft environmental supplement issued October 25, 1978, by the Department of the Interior. The draft supplement considers several alternative administrative actions proposed for classification of Alaska's "National Interest Lands". The court is requested to enjoin defendants from closing the comment period prior to 45 days from October 30, 1978, the date the draft supplement generally was available in the State of Alaska, and to enjoin defendants from taking any final administrative actions on the Alaska National Interest Lands until at least 90 days have elapsed from October 30, 1978. The court is also asked to require that one copy of the environmental supplement and the 28-volume 1974 Final Environmental Impact Statement on the Alaska land proposals be made available in each town in Alaska that has a public library. A brief order was filed on November 24, 1978, which denied the motion, and noted that this memorandum would follow.

### Factual Background

In 1971 the Congress included in the Alaska Native Claims Settlement Act (ANCSA) a provision which directed the Secretary of Interior

> "to withdraw from all forms of appropriation under the public land laws, including the mining and mineral leasing laws, and from selection under the Alaska Statehood Act, and from selection by the Regional Corporations . . . up to, but not to exceed, eighty million acres of unreserved public lands in the State of Alaska, including previously classified lands, which the Secretary deems are suitable for addition to or creation as units of the National Park, Forest, Wildlife Refuge, and Wild and Scenic Rivers Systems . . . "

Section 17(d)(2)(A), 43 U.S.C.A. § 1616(d)(2)(A) (Supp.1978).[1] Section 17(d)(1) also authorized the Secretary of Interior to withdraw, under existing authority, lands needed to protect the public

---

1. For a previous case involving the Secretary of Interior's exercise of discretion under Section 17(d)(2) see *Burglin v. Morton*, 527 F.2d 486, 489 (9th Cir. 1976).

interest.[2] Beginning in March, 1972, the Secretary issued a series of public land orders which withdrew millions of acres of public lands in Alaska. Lands withdrawn under section 17(d)(2) were simultaneously withdrawn under 17(d)(1). The "d–2" withdrawals expire on December 16, 1978, while the "d–1" withdrawals have no time limit.

On December 17, 1973, Secretary of Interior Morton submitted recommendations for the legislative protection and classification of approximately 83 million acres of federal public land in Alaska. A draft environmental impact statement was released to the public at that time and after a period of public comment a 28-volume final environmental statement was issued on the Alaska lands legislative proposals. These procedures fully complied with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C) (1976).

In September, 1977, Interior Secretary Andrus submitted the current Administration's proposals for legislation at the request of the Chairman of the House Committee on Interior and Insular Affairs. The House passed an Alaska lands bill in May, 1978, but the bill failed in the Senate during the final hours of the Congressional session. When prospects for Congressional action dimmed, the Department of Interior assembled a Task Force which began to consider alternative administrative actions to preserve the status quo until the next Congressional session could consider the various Alaska lands legislative proposals.[3] This Task Force prepared a supplement to the 1974 legislative environmental impact statement and discussed new information gathered since 1974, the impact of a number of possible administrative and executive actions that could be taken to add layers of protection to the lands involved in the various legislative proposals, and new areas not previously discussed in the 1974 impact statement. The area discussed in the supplement covers approximately 99 million acres of federal lands in Alaska.

After conferring with the Council on Environmental Quality[4] regarding the proper procedures to be employed, the Department of Interior released the draft supplement on October 25, 1978, with the 25-day public comment period scheduled to end on November 20. By agreement of the parties the comment period was extended to November 22.

During the comment period the State of Alaska filed this suit challenging the length of the comment period and the legality of the various administrative actions proposed. The only issue before the court on this motion is the length of the comment period. On November 14, 1978, the State filed land selections on 41 million acres of land including 9 million acres within the national interest lands areas discussed in the draft supplement. (See Affidavit of Secretary An-

---

**2.** Section 17(d)(1), 43 U.S.C.A. 1616(d)(1) provides as follows:

Public Land Order Numbered 4582, 34 Federal Register 1025, as amended, is hereby revoked. For a period of ninety days after December 18, 1971, all unreserved public lands in Alaska are hereby withdrawn from all forms of appropriation under the public land laws, including the mining (except locations for metalliferous minerals) and the mineral leasing laws. During this period of time the Secretary shall review the public lands in Alaska and determine whether any portion of these lands should be withdrawn under authority provided for in existing law to insure that the public interest in these lands is properly protected. Any further withdrawal shall require an affirmative act by the Secretary under his existing authority, and the Secretary is authorized to classify or reclassify any lands so withdrawn and to open such lands to appropriation under the public land laws in accord with his classifications. Withdrawals pursuant to this paragraph shall not affect the authority of the Village Corporations, the Regional Corporations, and the State to make selections and obtain patents within the areas withdrawn pursuant to section 1610 of this title.

**3.** The details of this process are presented to the court in an affidavit by Susan C. Kemnitzer, Special Assistant to the Secretary of the Interior, Attachment A. The Task Force included specialists in a variety of social and natural scientific fields.

**4.** The Council of Environmental Quality (CEQ) is the agency created by NEPA to "review and appraise the various programs and activities of the Federal Government in the light of the policy" of NEPA, 42 U.S.C. § 4344(3) (1976).

drus, defendant's attachment E). On November 16, 1978, after receiving a letter from the House Committee on Interior and Insular Affairs the previous day,[5] the Secretary of Interior determined that an emergency existed and exercised his power under section 204(e) of the Federal Land Policy and Management Act, 43 U.S.C.A. § 1714(e) (Supp.1978), withdrawing in excess of 100 million acres from the federal public domain in Alaska.[6]

### Standards for a Preliminary Injunction

■ The considerations in determining whether to grant or deny injunctive relief in a case of this type are three-fold: (1) have the movants established a strong likelihood of success on the merits; (2) does the balance of irreparable harm favor the movants and (3) does the public interest favor granting the injunction? *Sierra Club v. Hathaway*, 579 F.2d 1162, 1167 (9th Cir. 1978); *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549 (9th Cir. 1977); *Alpine Lakes Protection Society v. Schlapfer*, 518 F.2d 1089 (9th Cir. 1975).[7] The granting or withholding of a preliminary injunction rests in the sound discretion of the trial court. *County of Santa Barbara v. Hickel*, 426 F.2d 164, 168 (9th Cir. 1970).

### Likelihood of Success on the Merits

In determining whether the State of Alaska has shown a probability of success on the merits on the issue of the legality of the shortened comment period, the court must decide whether the impact statement requirement of NEPA applies to the various Presidential and Secretarial actions proposed in the environmental supplement and whether, assuming NEPA applies, the comment period is in accordance with NEPA and the CEQ Guidelines, 40 C.F.R. Part 1500 (1977).

### The Application of NEPA

The proposed executive action discussed in the supplement include: (1) Presidential action under the Antiquities Act, 16 U.S.C. § 431 (1976), proclaiming national monuments; (2) an emergency withdrawal of public lands by the Secretary of Interior under section 204(e) of the Federal Land Policy and Management Act (FLPMA), 43 U.S.C.A. § 1714(e) (Supp.1978); (3) an order by the Secretary of Interior segregating land from the operation of the public land laws under section 204(b) of FLPMA, 43 U.S.C.A. § 1714(b) (Supp.1978); (4) a final Secretarial withdrawal of more than five thousand acres for twenty years under section 204(c), 43 U.S.C.A. § 1714(c) (Supp. 1978); and (5) a replacement by the Secretary of Interior of lands selected by Native corporations in National Wildlife Refuges by adding public lands in Alaska to the Refuge System under section § 22(e) of ANCSA, 43 U.S.C.A. § 1621(e) (Supp.1978). In applying NEPA to these actions distinctions must be drawn between the various withdrawal powers so as to harmonize the Congressional commands of NEPA with the purposes and Congressional intent of the Antiquities Act and FLPMA.

■ NEPA requires "agencies of the Federal government" to prepare a detailed impact statement for legislative proposals and "other major Federal actions signifi-

---

5. The letter from Chairman Udall stated in part:

   [I]n view of the most recent selections filed by the State of Alaska, its new lawsuit and its threat to seek immediate judicial remedies to prevent administrative actions to protect these lands, I must emphasize to you, on behalf of the Committee on Interior and Insular Affairs of the U. S. House of Representatives, that an emergency exists with respect to the national interest lands. Extraordinary measures must be taken now to assure the preservation of the important values in these lands, which will be lost if such measures are not promptly effected. We urge you to exercise your authority under section 204(e) of the Federal Land Policy and Management Act of 1976 immediately, to assure that these significant values are saved.

   (The letter is included with Attachment E).

6. Public Land Order 5653 as amended by Public Land Order 5654 (Attachments F and G).

7. The court has also considered the alternative test of *Wm. Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 88 (9th Cir. 1975). The result in this case is the same under either test.

cantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (1976).[8] *See generally, Flint Ridge Dev. Co. v. Scenic Rivers Assn.*, 426 U.S. 776, 785–88, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976); *Calvert Cliffs' Coord. Comm. v. Atomic Energy Comm'n.*, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971). The impact statement is intended to serve two purposes. First, it should provide federal agencies with an environmental disclosure sufficiently detailed to aid in the decision whether to proceed with the project or program in light of its environmental consequences. *Calvert Cliffs*, 146 U.S.App.D.C. at 38, 449 F.2d at 1114. Second, the statement will provide the public with information on the agencies' proposed action as well as encourage public participation in the development of that information. *Environmental Defense Fund v. Corps of Engineers*, 325 F.Supp. 749, 759 (E.D.Ark.1971), dismissed, 342 F.Supp. 1211, aff'd 470 F.2d 289 (8th Cir. 1972).

The government contends that Presidential actions under the Antiquities Act[9] are not subject to the impact statement requirements of NEPA because NEPA applies only to "federal agencies" and the President is not a federal agency. The court finds this argument persuasive. The Antiquities Act authorizes the President "in his discretion" to declare objects that have scientific interest, and are situated upon the public lands, to be national monuments. *See Cappaert v. United States*, 426 U.S. 128, 141–42, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976) (Devil's Hole); *Cameron v. United States*, 252 U.S. 450, 455–56, 40 S.Ct. 410, 64 L.Ed. 659 (1919) (the Grand Canyon); *State of Wyoming v. Franke*, 58 F.Supp. 890 (D.Wyo.1945) (Jackson's Hole). The Act authorizes only the President to declare these reservations and apparently this authority cannot be delegated.

While the declaration of policy in NEPA requires the full consideration of environmental consequences in all of the

---

**8.** 42 U.S.C. § 4332 provides in relevant part:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

. . . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council of Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

**9.** The Antiquities Act, 16 U.S.C. § 431 provides:

The President of the United States is authorized, in his discretion, to declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments, and may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with the proper care and management of the objects to be protected. When such objects are situated upon a tract covered by a bona fide unperfected claim or held in private ownership, the tract, or so much thereof as may be necessary for the proper care and management of the object, may be relinquished to the Government, and the Secretary of the Interior is authorized to accept the relinquishment of such tracts in behalf of the Government of the United States.

federal government's activities, 42 U.S.C. § 4331, the Act limits the "action-forcing" impact statement process to "agencies of the Federal government", *id.* § 4332. When the Congress imposed duties upon the office of the President, such as in § 4341, that office was specifically mentioned. No cases have been brought to the court's attention that hold that the President must file an environmental impact statement prior to acting under a specific delegation of Congressional authority such as is embodied in the Antiquities Act. Moreover, the doctrine of separation of powers prevents this court from lightly inferring a Congressional intent to impose such a duty on the President. For these reasons the court holds that the President is not subject to the impact statement requirement of NEPA when exercising his power to proclaim national monuments under the Antiquities Act.

The State conceded at oral argument that the President acting under the Antiquities Act was not subject to NEPA but contended that the Secretary of Interior could not advise him as to the proposed boundaries or assist him in any way without triggering the impact statement process of NEPA. The argument that the President cannot ask for advice, and must personally draw lines on maps, file the necessary papers, and the other details that are necessary to the issuance of a Presidential Proclamation in order to escape the procedural requirements of NEPA approaches the absurd.

Article II, Section 2, Clause 1 of the Constitution states in part:

[The President] may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective offices . . .

■ On November 16, 1978, the President requested Secretary Andrus to provide him with recommendations on the suitability of lands in Alaska for designation as national monuments under the Antiquities Act of 1906.[10] For a court to require that an impact statement must be filed after the specified comment period before the President could receive the recommendations of the Secretary would raise serious constitutional questions. A familiar maxim of statutory construction is that "when one interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a 'clear statement' of a contrary legislative intent." *United States v. Thompson,* 147 U.S.App.D.C. 1, 5, 452 F.2d 1333, 1337 (1971). *See also United States v. Rumely,* 345 U.S. 41, 45, 73 S.Ct. 543, 97 L.Ed. 770 (1953). *Boucher v. Engstrom,* 528 P.2d 456, 462 (Alaska 1974). Applying the impact statement process to such recommendations necessarily burden and inhibit "the policy of open, frank discussion between subordinate and chief concerning administrative action". *Environmental Protection Agency v. Mink,* 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973) quoting *Kaiser Aluminum & Chemical Corp. v. United States,* 157 F.Supp. 939, 946, 141 Ct.Cl. 38 (1958) (Reed, J.). For these reasons the court holds that any recommendations by the Secretary of Interior on the exercise of the President's powers under the Antiquities Act, which recommendations have been requested by the President, do not come under the NEPA impact statement process.

■ The court now turns to the issue of NEPA's application to the Secretary's

---

**10.** The letter states:

To Secretary Andrus

As you know, the 95th Congress adjourned without passing the Alaska National Interest Lands legislation. Protection for these lands is the highest environmental priority of my Administration.

Since Congress' failure to act means that the so-called "d–2" withdrawals will expire next month, I am requesting your opinion on what, if any, action the Administration can and

should take to protect Alaska lands until legislative proposals are enacted. I particularly seek your advice on the suitability of the lands for designation as national monuments under the Antiquities Act of 1906.

In order that I may decide on the appropriate course of action before the statutory deadline, please provide me with your recommendations in writing by November 27, 1978.

Sincerely,
Jimmy Carter

emergency withdrawal powers. When it is not possible to follow the impact statement process without conflicting with a specific statutory mandate, the Court has held that the requirements of NEPA must yield. *Flint Ridge Dev. Co. v. Scenic Rivers Assn.*, 426 U.S. 776, 788, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976). This rationale has been applied to the promulgation of an Emergency Temporary Standard on carcinogens in the workplace issued by the Occupational Safety and Health Administration, *Dry Color Manufacturers Ass'n v. Department of Labor*, 486 F.2d 98, 107–07 (3rd Cir. 1973), to emergency gas curtailment orders of the Federal Power Commission, *Alabama Gas Corp. v. Federal Power Comm'n.*, 476 F.2d 142 (5th Cir. 1973), and to orders under the Petroleum Allocation Act, *Gulf Oil Corp. v. Simon*, 502 F.2d 1154 (Em.App.1974). Section 204(e) of FLPMA, 43 U.S.C.A. § 1714(e) [11] requires the Secretary to "immediately make a withdrawal" of public lands when he determines or is notified by either of the appropriate Congressional committees that an emergency exists. To require the Secretary to file an impact statement and impose its prescribed comment period would frustrate the mandate of the statute that the withdrawal be "immediate." The need for haste is emphasized by the provision in FLPMA which exempts these emergency withdrawals from the requirement of a public hearing. 43 U.S.C.A. § 1714(h) (Supp.1978). The court holds that an emergency withdrawal under § 204(e) of FLPMA does not require a NEPA environmental impact statement.

While the government contends that the other alternative withdrawal powers are also not covered by NEPA, the court finds the argument that they are "major federal actions significantly affecting the quality of the human environment" so substantial that the remaining issue of whether the comment period was adequate in these circumstances will have to be decided.

*The Adequacy of the Comment Period*

As discussed earlier, the October, 1978, report of the Department of the Interior was a supplement to an earlier multi-volume environmental impact statement (EIS) issued in 1974. The earlier EIS had considered the impact of a legislative withdrawal of 83 million acres for inclusion into the National Park System, the Wildlife Refuge System, the Forest System, and the Wild and Scenic Rivers System (known collectively as the National Conservation Systems).

The supplement was designed to add to this 83 million acre area sufficient acreages to cover all the possible withdrawals raised during the last Congressional session by either of the two Houses and by the President, and to evaluate the additional impact, if any, of proposed administrative and presidential withdrawals. The supplement was also designed to consider substantial changes in impacts since the date of the original EIS. An example of such a change was the consideration in the supplement of the impact on subsistence lifestyle and/or sport hunting if these activities were prohibited in National Park Service administered areas. With regard to the additional acreages involved, the Department of the Interior noted that

Our review demonstrated that any portion of an administrative study area outside the boundaries discussed in the 1974

---

11. 43 U.S.C.A. § 1714(e) (Supp.1978) states:

(e) When the Secretary determines, or when the Committee on Interior and Insular Affairs of either the House of Representatives or the Senate notifies the Secretary, that an emergency situation exists and that extraordinary measures must be taken to preserve values that would otherwise be lost, the Secretary notwithstanding the provisions of subsections (c)(1) and (d) of this section, shall immediately make a withdrawal and file notice of such emergency withdrawal with the Committees on Interior and Insular Affairs of the Senate and the House of Representatives. Such emergency withdrawal shall be effective when made but shall last only for a period not to exceed three years and may not be extended except under the provisions of subsection (c)(1) or (d) of this section, whichever is applicable, and (b)(1) of this section. The information required in subsection (c)(2) of this subsection shall be furnished the committees within three months after filing such notice.

EIS merely shifted the geographical locus of the impacts of environmentally protective action. *The environmental impacts of administrative action on those portions remained substantially similar to those reported in the 1974 EIS.* Defendant's Attachment A, at 5, Affidavit of Susan C. Kemnitzer, Special Assistant to the Secretary of the Interior. (emphasis added) The Department's overall conclusion was that aside from certain boundary changes,

> The major area where anticipated environmental impacts resulting from the Administrative actions would substantially differ from the environmental impacts discussed in the 1974 EIS is the impact of disallowing subsistence and sport hunting in National Park Service-administered areas. The 1974 EIS did not discuss the impacts of disallowing such activities.

Id. at 5–6.

After careful review of the record the court agrees with the Government's characterization of the October, 1978, document as a supplement to the earlier EIS and not itself an independent statement. This is so because the supplement considered either environmental impacts omitted from what would be, in 1978, a deficient EIS, or discussed changes in the earlier EIS which are more properly characterized as modifications of a major federal action earlier considered in a final EIS rather than independent major federal actions. The method of using supplemental impact statements is implicitly endorsed in the guidelines, 40 C.F.R. § 1500.11(b) cl. 4 (discussed below), and by the courts. *See e.g. Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 91–92 (2d Cir. 1975) ("We agree with the district court that the use of supplemental data and statements is permissible to bolster an otherwise deficient EIS or to amend an EIS to consider changes in the proposed federal action . . . ."); *Natural Resources Defense Council v. U.S. Nuclear Regulatory Comm'n*, 539 F.2d 824, 840 (2d Cir. 1976).

Assuming that the provisions of NEPA required that a NEPA evaluation accompany the proposed administrative land withdrawal actions, the next issue presented is how much time, if any, should have been required for notice and comment on the proposed supplement to the earlier EIS.[12]

The Council on Environmental Quality (CEQ) was established by Congress in NEPA.[13] Pursuant to the authority granted thereunder[14] and under Executive Order 11514, the CEQ promulgated guidelines for the preparation of impact statements.[15] Although these guidelines do not have the force of law, they have consistently been regarded with great deference when courts have been faced with problems of statutory construction.[16]

---

12. The procedures attendant the drafting of the 1974 EIS are not here called into question.

13. 42 U.S.C.A. § 4342; E. O. No. 11514, Sec. 3(h)–(i) (March 5, 1970), 3 C.F.R. 271 (1974).

14. 42 U.S.C.A. §§ 4341–4345.

15. 40 C.F.R. pt. 1500 (1977).

16. *See Environmental Defense Fund v. T.V.A.*, 468 F.2d 1164, 1178 (6th Cir. 1972); *Carolina Action v. Simon*, 389 F.Supp. 1244, 1246–47 (M.D.N.C.), *aff'd* 552 F.2d 295 (4th Cir. 1975). The Second Circuit has stated that the guidelines are "merely advisory" but then went on to emphasize that it would "not lightly suggest" that CEQ has misconstrued NEPA. *Greene County Planning Bd. v. FPC*, 2 Cir., 455 F.2d 412, 421, *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972).

Mr. Justice Douglas sitting as a Circuit Justice referred to CEQ as the agency "ultimately responsible for administration of the NEPA and most familiar with its requirements" for EIS's. Its interpretation of the Act "is entitled to great weight." *Warm Springs Dam Task Force v. Gribble*, 417 U.S. 1301, 1310, 94 S.Ct. 2542, 2547, 41 L.Ed.2d 654, (Douglas, J., Circuit Justice), *motion to vacate stay denied*, 418 U.S. 910, 94 S.Ct. 3202, 41 L.Ed.2d 1156 (1974).

Although CEQ was created by NEPA, it derives its authority to issue guidelines on EIS preparation not from the statute but from Exec. Order No. 11,514. The order was issued "in furtherance of the purpose and policy of" NEPA. It gives CEQ the power to "[i]ssue guidelines to federal agencies for the preparation of detailed statements on proposals for legislation and other federal actions affecting the environment, as required by section 102(2)(c) of [NEPA]." 3 C.F.R. 271, 272, § 3(h)

With regard to CEQ's application of those guidelines, it has long been recognized as a principle of statutory construction that an agency interpretation of its regulations is entitled to great weight within areas of agency expertise. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). However, courts are not obliged to "stand aside and rubber-stamp [agency] affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the Congressional policy underlying the statute." *S.E.C. v. Sloan*, 436 U.S. 103, 118, 98 S.Ct. 1702, 1712, 56 L.Ed.2d 148 (1978) (quoting *Volkswagenwerk v. Federal Maritime Comm'n.*, 390 U.S. 261, 272, 88 S.Ct. 929, 19 L.Ed.2d 1090 (1968).

> [O]ne factor to be considered in giving weight to an administrative ruling is "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking in power to control."

*Adamo Wrecking Co. v. U. S.*, 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 574 n. 5, 54 L.Ed.2d 538 (1978) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

With this standard in mind the court turns to the particular CEQ guidelines relevant to the determination of an adequate notice and comment period following a draft supplement to an EIS.

■ Section 1500.11 of Title 40, Code of Federal Regulations, directs that a certain time-table be followed in the drafting of final environmental impact statements prior to executing the subject major federal action. However, this prescribed time-table is made applicable only to original impact statements (in this case, the 1974 EIS) and not to supplements. Rather with regard to the latter document § 1500.11(b) provides that

An agency may at any time supplement or amend a draft or final environmental statement, particularly when substantial changes are made in the proposed action, or significant new inforn.ation becomes available concerning its environmental aspects. *In such cases the agency should consult with the Council with respect to the possible need for or desirability of recirculation of the statement for the appropriate period.* (Emphasis added) .

The court construes this to mean, and the parties agree, that this subsection requires, in a situation involving a supplement to an EIS, consultation with the CEQ to determine the appropriateness of any relevant time periods including the notice and comment period.

Defendants' Attachment B, letter from Leo M. Krulitz, Solicitor, Department of the Interior, to Nicholas Yost, General Counsel, Council on Environmental Quality (October 16, 1978) indicates that an inquiry was made to CEQ prior to publication of the draft supplement in an effort to secure advice from CEQ as to an appropriate notice and comment period. This letter included a recitation of the relevant factual situation at that time and the reasons underlying Interior's proposed time-table. On October 17, 1978, the Krulitz letter was answered in a hand-carried letter from Yost to Krulitz. The letter reasoned that "[g]iven the time constraints imposed by a combination of Congressional inaction in the just-concluded session and the upcoming December 18 deadline," the requirements of NEPA and the CEQ guidelines would be satisfied if the Department (1) provided advance notice to the public of the supplement's issuance, (2) provided 25 days for public review and comment on the draft, (3) issued a final supplement within 10 to 15 days after the close of the comment period, incorporating responses to significant comments made on the draft.

■ These communications constituted the § 1500.11(b) consultation with CEQ that

(1974). *See* Comment, *The Council on Environmental Quality's Guidelines and Their Influ-* *ence on the National Environmental Policy Act*, 23 Cath.U.L.Rev. 547 (1974).

was required in order to establish a time-table. By its own guidelines it was unnecessary for CEQ to impose a § 1500.9(f) 45-day comment period on Interior's circulation of the draft if consultation, as required, justified a different time period. While it may be that no recirculation or time-table is required where a supplement merely clarifies or amplifies an adequate EIS, *Environmental Defense Fund, Inc. v. Froehlke*, 368 F.Supp. 231, 236–37 (W.D.Mo.1973), *aff'd sub nom., Environmental Defense Fund, Inc. v. Callaway*, 497 F.2d 1340 (8th Cir. 1974), or involves insignificant modifications, *Woida v. U.S.*, 446 F.Supp. 1377, 1384 (D.Minn.1978), where "substantial changes" (the language of § 1500.11(b)) are made *some* time-table would seem to be required to meet the purposes of NEPA. *Woida*, at 1384 (dicta); *NRDC v. Callaway*, 524 F.2d at 91–92; *National Wildlife Federation v. Andrus*, 440 F.Supp. 1245, 1252 n. 13 (D.C. D.C.1977). This does not mean, however, that all the usual time periods for an EIS are to be applied in such circumstances; to do so would nullify the whole purpose in having the consultation clause of § 1500.-11(b), whereby the CEQ is permitted to weigh the factors relevant to establishing the time-table.

The court concludes that establishment of the 25-day comment period on a draft supplement to an EIS was a reasonable interpretation and application of the guidelines and constituted a responsible exercise of discretion, not an abuse thereof.

The state also argues that the period following the comment period is impermissibly short as the guidelines normally call for a 90-day lag between the close of the comment period and final agency action, For the same reasons as stated above with regard to the notice and comment period, this argument is also rejected. Moreover, it should be noted that even with regard to original impact statements, subsection (e) of § 1500.11 of the guidelines provides that;

> Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provision of these guidelines

concerning minimum periods for agency review and advance availability of environmental statements, the federal agency proposing to take the action should consult with the Council about alternative arrangements. Similarly, where there are overriding considerations of expense to the Government or impaired program effectiveness, the responsible agency should consult with the council concerning appropriate modifications of the minimum periods.

Although this court does not rule that this subsection is applicable in light of the earlier conclusion that the October, 1978, document was a supplement, the above language merely indicates that the guidelines themselves never envisioned that the 90-day time period was a mandatory minimum from which no departure would or could be permitted. Rather, it buttresses the court's opinion that the guidelines were meant to vest the CEQ with considerable discretion in tailoring the procedural requirements of NEPA to the particular circumstances which would later arise. Accordingly, it is concluded that the CEQ properly exercised this discretion in view of all the factors attendant its decision at that time. There was no abuse of discretion in the CEQ's October 17, 1978, decision approving a shortened time-table for the draft supplement; a further scrutiny by this court is not warranted.

The court concludes that with respect to the State of Alaska's claim that the time limitations of NEPA and the CEQ guidelines have been violated, this claim has no probability of success on the merits that would justify issuance of a preliminary injunction against the President or the Department of the Interior.

In conclusion, the court finds that the State of Alaska has demonstrated little probability of success on the merits on any of its proffered legal theories.

*Irreparable Injury*

Although a lack of probability of success on the merits precludes issuance of an injunction, the court notes that as the moving

party, the State also must demonstrate that it will be irreparably harmed. The State contends that its state selections are threatened by the proposed alternatives in the Supplement. However, if the land withdrawals are eventually declared invalid, the State will be able to receive the land selections it has made. The State has not demonstrated that its injury could not be removed when the ultimate issues in this case are reached.

*The Public Interest*

Both parties have touched upon the merits of the "d-2" issue by arguing what the public interest is in granting or denying an injunction. This court will not be drawn into the merits of the land issue in Alaska under the rubric of "public interest." The ultimate decision on public lands has been delegated to the Congress by Article I of the Constitution and the public interest lies in allowing the Congress to make the ultimate decision. That interest will be hindered if the status quo of the concerned lands is not maintained until the Congress can render that decision.

Accordingly IT IS ORDERED:

1. THAT the motion for a temporary restraining order is denied.

2. THAT the motion for a preliminary injunction is denied.