**C. BURGLIN, et al.,**
**Plaintiffs-Appellants,**

**v.**

**Rogers C. B. MORTON, as the Secretary**
**of the Interior of the United States, et**
**al., Defendants-Appellees.**

**No. 74-2761.**

United States Court of Appeals,
Ninth Circuit.

Dec. 19, 1975.

Rehearing Denied Jan. 27, 1976.

William Robert Hickman (argued), Reed, McClure, Moceri & Thonn, Seattle, Wash., for plaintiffs-appellants.

Carl Strass (argued), U. S. Dept. of Justice, Washington, D.C., for defendants-appellees.

## OPINION

Before DUNIWAY, TRASK and SNEED, Circuit Judges.

SNEED, Circuit Judge:

Plaintiffs filed four lawsuits charging that the Secretary of the Interior had wrongfully rejected their several offers for noncompetitive oil and gas leases. The district court consolidated the cases, and granted summary judgment in favor of the government defendants. Plaintiffs appeal from that decision. We find that there is no genuine issue of material fact with respect to any properly justiciable issue, and affirm the district court's dismissal as a matter of law.

During the latter half of 1968 four small groups of individual plaintiffs (plaintiff Burglin being a member of each group) made several offers for oil and gas leases in the State of Alaska. Each of the offers, made pursuant to Section 17 of the Mineral Lands Leasing Act, as amended, 30 U.S.C. § 226, was rejected by the Bureau of Land Management on the ground that one of the lease offerors (Burglin in each case) could not

be identified on the offer form due to an illegible signature. Each of the rejections was appealed to the Interior Board of Land Appeals, which affirmed in each case.[1]

Although the signature defects were cured subsequent to the date of original filing, in the interim the lands had been withdrawn from oil and gas entry under Public Land Order 4582 (January 17, 1969). The lands have remained withdrawn under the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 et seq. (December 18, 1971), and Public Land Order 5179 (March 9, 1972). Since the land was withdrawn prior to the date on which plaintiffs' cured offers became effective, the Bureau of Land Management again rejected plaintiffs' offers and the Board affirmed. Plaintiffs then sought judicial review.

■ Plaintiffs first urge that 30 U.S.C. § 226(c) required the Secretary to issue the leases to them. The offers were made pursuant to the Mineral Leasing Act of 1920, 30 U.S.C. § 181 et seq. Section 226 of Title 30 provides in pertinent part:

§ 226. *Lease of oil and gas lands—Authority of Secretary.*

(a) All lands subject to disposition under this chapter which are known or believed to contain oil or gas deposits may be leased by the Secretary.

\* \* \* \* \* \*

*Lands not within geologic structure of a producing oil or gas field; first qualified applicant.*

(c) If the lands to be leased are not within any known geological structure of a producing oil or gas field, the person first making application for the lease who is qualified to hold a lease under this chapter shall be entitled to a lease of such lands without competitive bidding. Such leases shall be conditioned upon the payment by the lessee of a royalty of 12½ per centum in amount or value of the production removed or sold from the lease.

The permissive word "may" in Section 226(a) allows the Secretary to lease such lands, but does not require him to do so. Although Section 226(c) requires the Secretary to issue the lease to the first qualified applicant *if* the land is leased, the Secretary has discretion to refuse to issue any lease at all on a given tract. *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 13 L.Ed. 616 (1965). As this Court found in *Pease v. Udall*, 332 F.2d 62 (9th Cir. 1964):

" . . . [T]he Mineral Leasing Act has consistently been construed as leaving to the Secretary, within his discretion, a determination as to what lands are to be leased thereunder." *Id.* at 63.

■ Given the Secretary's discretion whether to lease the lands at all, plaintiffs' offer to lease could not, in and of itself, vest plaintiffs with any right to a lease, and plaintiffs' contention that Section 226(c) required the Secretary to issue the leases was properly dismissed as a matter of law.[2]

Plaintiffs further allege a cause of action grounded upon abuse of discretion or arbitrary and capricious conduct by the Secretary in exercising his discretionary authority. Actually, plaintiffs allege two different types of abuse of discretion. One relates to the initial rejection of plaintiffs' offers due to the illegible signature, the other to the subsequent withdrawal of the lands by the Secretary and the Congress.

With respect to the withdrawal of the lands, plaintiffs' complaints portray a grandiose scheme perpetrated by high

---

1. *R. C. Bailey, et al.,* 7 IBLA 266 (1972); *Helen S. Bailey,* 8 IBLA 145 (1972); *William D. Sexton, et al.,* 9 IBLA 316 (1973); *Earnest and Dora A. Carter, et al.,* 12 IBLA 181 (1973).

2. Plaintiffs also allege that the withdrawal of land pursuant to Public Land Order 4582 was a constitutionally infirm taking of plaintiffs' property without due process of law. Since the filing of the applications did not vest in the plaintiffs any right to leases, or generate any legal interest similar to a property right, *Duesing v. Udall,* 121 U.S.App.D.C. 370, 350 F.2d 748, 750–51 (1965), there could be no taking, and this contention is without merit.

officials of the Department of Interior malevolently to restrict Alaskan oil production. The complaints, couched only in the most conclusory and broad terms, allege that the Secretary's policies are arbitrary, capricious, and done "to evade and circumvent the will of the people of the United States, as expressed in the 1920 Mineral Leasing Act."

There is absolutely no evidence in the record to suggest the existence of the sinister scheme alleged by plaintiffs. But plaintiffs urge that summary judgment under Fed.R.Civ.P. 56 was not appropriate since defendants did not come forward with facts to disprove the conspiracy, and since plaintiffs were not given access to defendants' files in order to obtain evidence with which to prove the conspiracy. The Government by affidavit could not set forth all the specific evidence needed to demonstrate the absence of the alleged conspiracy. To do so would entail the recitation of the long history of the Government's many actions affecting the petroleum resources of this nation. The Government's only practical response is to deny the conspiracy in terms no less broad and general than those used in the complaints. Perhaps strict adherence to the dictates of summary judgment would require this formality, but for reasons discussed below, we need not reach this issue. Furthermore, we find little merit in plaintiffs' argument that they cannot adduce any factual basis for their allegations without discovery. Plaintiffs cannot even describe the facts for which they hope to find support. As Professor Moore states:

"The mere averment of exclusive knowledge or control of the facts by the moving party is not adequate: the opposing party must show to the best of his ability what facts are within the movant's exclusive knowledge or control; what steps have been taken to obtain the desired information pursuant to the discovery procedures under the Rules; and that he is desirous of taking advantage of these discovery procedures." 6 J. Moore, Federal Practice ¶ 56.24 at 2876 (2d ed. 1948).

■■ However, the crucial difficulty with plaintiffs' position lies far from the technical confines of Rule 56. The action of the Secretary in withdrawing lands was mandated by Congress, 43 U.S.C. § 1616(d)(2)(A); the selection of the lands to be withdrawn was an *exercise* of discretion, rather than an abuse of discretion. We do not doubt that Congress' withdrawal of huge amounts of Alaskan land from lease entry perhaps restricted oil production in the United States at a time, as plaintiffs allege, of a "strong and pressing need for and a great shortage of domestically produced oil and gas." However, it is the proper function of Congress and the Executive to set and implement the national energy policy. It is not the function of the judiciary generally to investigate and review the wisdom of this policy. We are a court, not a committee of Congress or department of the Executive. Plaintiffs' complaints, couched in broad terms of public policy, simply do not allege a justiciable cause of action. The gravamen of this aspect of plaintiffs' complaints is a policy determination for which judicially manageable standards are lacking. *See Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

■ The only remaining aspect of plaintiffs' complaints concerns the alleged abuse and arbitrariness with respect to the initial rejection of the offers due to the illegible signature. Although we have shown that the Secretary has discretion to lease the lands, the initial rejection of plaintiffs' offers must not have been arbitrary and capricious, thereby precluding plaintiffs from obtaining leases before withdrawal of the lands.

The applicable regulations require that "[e]ach offer must be filled in by typewriter or printed plainly in ink and signed in ink by the offeror . . . ." 43 C.F.R. § 3111.1–1. The Bureau of

Land Management and the Interior Board of Land Appeals have interpreted this to require more than a legally binding signature. *See* cases cited in footnote 1, *supra.* The signatures must be plainly legible or accompanied by a clear identification of all persons whose signatures appear thereon.

■■ When courts are called upon to review the Secretary's interpretation of regulations made by him, his interpretation is entitled to deference. *Harvey v. Udall,* 384 F.2d 883, 885 (10th Cir. 1967). In the words of the United States Supreme Court:

> "The Secretary's interpretation may not be the only one permitted by the language of the orders, but it is quite clearly a reasonable interpretation; courts must therefore respect it."
> *Udall v. Tallman, supra,* 380 U.S. at 4, 85 S.Ct. at 795.

The plaintiffs have not made a tender of evidence sufficient to overcome the presumption of validity of administrative action. This Court "does not presume to substitute its discretion for that of the Secretary." *Duesing v. Udall, supra* at 752. We hold that there was no abuse of discretion in the initial rejection of the applications.

■ This conclusion is not altered even if it be true that certain employees in the Anchorage Land Office knew plaintiff Burglin's signature. Ordinarily no duty exists on the part of such employees to inform offerors of their failure to comply with the Secretary's regulations. Compliance with such regulations is the offerors' responsibility. Even if such employees in this case wrongfully misled the plaintiff Burglin we reject the conclusion that the Secretary is estopped to reject the offers. The alleged improprieties of the employees in the Land Office simply cannot be used to compel the Government to accept a lease offer that it had statutory discretion to reject. None of the conduct alleged herein approaches the magnitude necessary for us to consider whether that conduct would be sufficient to estop the Government from either requiring proper applications or rejecting completed applications.[3]

Since we have determined from the record that there are no material issues of triable fact relevant to any cognizable cause of action, we need not discuss the sufficiency of, or rely upon, the Government's affidavit. We express no opinion as to the existence of a claim for damages against either the United States or the employees of the Anchorage Land Office due to any alleged improper conduct of the employees with respect to the signature issue. Nor do we wish to intimate under what circumstances there exists federal jurisdiction to hear such claims.

Affirmed.

---

3. *Cf. INS v. Hibi,* 414 U.S. 5, 8, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (at the minimum, affirmative misconduct necessary to estop Government with respect to time deadline to file naturalization applications.) *See also Santiago v. INS,* 526 F.2d 488 (9th Cir. 1975).