# Administrative Determination of Eligibility for Veterans' Beneficiary Travel Reimbursement

The Veterans Administration (VA) has discretion to determine on a case-by-case basis whether VA beneficiaries should be reimbursed for transportation costs incurred in connection with their receipt of VA medical care, and is not required to do so in all cases.

The permissive statutory term "may," used to describe the VA's administrative authority to reimburse transportation costs, should be interpreted in light of its plain meaning unless the legislative history reveals that such an interpretation would lead to absurd results, or consequences obviously at variance with the policy of the statute as a whole. The legislative history of the Veterans' Benefit Act of 1957 and its predecessor statutes is ambiguous with respect to Congress' intent in using the word "may" in the 1957 Act, and is thus not sufficiently compelling to contradict the plain language of the statute.

Notwithstanding the VA's consistent interpretation of the relevant provisions since 1957 to mandate travel reimbursement, legislative ratification of this administrative interpretation in subsequent amendments to the statute will not be found in the absence of clear and unambiguous congressional acceptance of the VA's position.

December 7, 1982

MEMORANDUM FOR THE COUNSEL TO THE DIRECTOR,
OFFICE OF MANAGEMENT AND BUDGET, AND THE
GENERAL COUNSEL, VETERANS ADMINISTRATION

This memorandum responds to Mr. Horowitz's request for our opinion whether the Veterans Administration (VA) has discretionary authority to determine administratively the eligibility of VA beneficiaries to receive reimbursement for certain travel expenses. Under 38 U.S.C. §§ 111, 601, 610, and 612,[1] the VA is authorized to reimburse certain transportation costs of eligible veterans traveling to receive VA covered medical benefits. The Office of Management and Budget (OMB) believes these sections do not require the VA to make such payments.[2] This conclusion is based on the fact that § 111 uses the permissive term "may" in describing the administrative authority to reimburse transportation expenses. The VA, on the other hand, construes these statutes as mandating payment of covered travel expenses of eligible veterans who are receiving VA

---

[1] All statutory references herein will refer to Title 38 of the U.S. Code unless otherwise specifically noted

[2] See Memorandum from Michael J. Horowitz, Counsel to the Director, OMB, to Theodore B. Olson, Assistant Attorney General (AAG), Office of Legal Counsel (OLC), June 11, 1982

medical care.[3] It argues that Congress intended the word "may" as used in all of these provisions to be mandatory, and that over the years Congress has never challenged the VA's interpretation that such payments are mandatory. The VA recognizes, however, that it has some discretion in determining the eligibility of certain veterans for travel expense reimbursement and in establishing the rate and mode of such reimbursement.

We have carefully studied both of your memoranda on this question. While there is some confusion over what Congress intended when passing these sections and amending them over the years, we believe the plain meaning of the language of these provisions indicates that Congress initially intended to grant the Administrator of the VA discretion regarding reimbursement of transportation costs. Because nothing in the legislative history of the relevant statutes and amendments to them clearly establishes that these statutes should be interpreted in a manner contrary to the plain meaning of the words employed and, in fact, the legislative history provides some support, albeit somewhat ambiguous, for the view that Congress intended these statutes to be discretionary, we conclude that the Administrator is not required under the relevant statutory provisions to reimburse the transportation costs of VA beneficiaries traveling to receive covered care.

We emphasize that our opinion does not suggest that the Administrator's current practices regarding payment of transportation should or must be changed. The Administrator may wish to continue present practices and is clearly authorized to do so. We merely conclude that such reimbursement is not mandated by the relevant statutory provisions.

## I. Statutory Language

Whether the Administrator must reimburse the travel expenses of eligible veterans depends upon the interpretation of four interrelated statutory provisions—§§ 111, 601, 610, and 612.

Section 610 supplies the basic authority for the Administrator of the VA to provide hospital and domiciliary care to veterans "within the limits of Veterans' Administration facilities." According to this section, the Administrator "may" furnish "hospital care" to veterans suffering from service-connected disabilities, to veterans who are suffering from non-service connected disabilities and who are unable to defray the necessary medical expense, and to veterans who meet certain other selected criteria.[4] The Administrator "may" also generally furnish

---

[3] See Memorandum from John P Murphy, General Counsel, VA, to Theodore B. Olson, AAG, OLC, June 16, 1982 (VA Memorandum).

[4] The Administrator may also provide hospital care to a veteran "whose discharge or release from the active military, naval, or air service was for a disability incurred or aggravated in line of duty"; "who is in receipt of, or but for the receipt of retirement pay would be entitled to, disability compensation"; who is 65 years or older; or who is a former prisoner of war. See § 610(a)(2), (3), (4), and (6) In addition, § 610 covers care for a veteran who served on active duty in Vietnam during the Vietnam War era and who the Administrator determines may have been exposed to dioxin or a toxic substance found in a herbicide or defoliant used for military purposes, or for a veteran who was exposed while on active duty to ionized radiation from the detonation of a nuclear device in a test of such device or during the American occupation of Japan in 1945-1946, so long as the VA Chief Medical Director does not find that the disability arises in either of these cases from a cause other than these two types of exposure See §§ 610(a)(5) and (e).

domiciliary care, pursuant to § 610(b), to veterans unable to defray the necessary expense, to veterans discharged from active service for a disability incurred or aggravated in the line of duty, or to permanently disabled persons in receipt of disability compensation who are incapacitated from earning a living and who have no adequate means of support.

Similarly, § 612 generally provides that the Administrator "may," "within the limits of Veterans Administration facilities," furnish "medical services" to veterans for any service-connected disability.[5]

The terms "hospital care," "medical services," and "domiciliary care" are defined in § 601 (5), (6), and (7), respectively, to include "travel and incidental expenses pursuant to the provisions of § 111 of this title." Section 111, in turn, provides that the Administrator "may pay the actual necessary expense of travel (including lodging and subsistence) or in lieu thereof an allowance based upon mileage traveled, of any person to or from a Veterans' Administration facility or other place in connection with vocational rehabilitation, counseling . . ., or for the purpose of examination, treatment, or care." Section 111, however, imposes a separate and independent limitation on the Administrator's authority to reimburse the transportation costs of veterans receiving *non*-service-connected care, as distinguished from service-connected care. With respect to such non-service-connected care, transportation expenses "may" only be covered when the Administrator has determined that a veteran is unable to defray the cost of travel, is receiving or is eligible to receive a VA pension under § 521, or has an annual income which does not exceed the maximum annual rate which would be payable to him under a VA pension. Thus, the Administrator is generally granted the *authority* to pay transportation costs of persons traveling to receive medical services, hospital care, or domiciliary care covered by the VA, but only in the circumstances specified in § 111 and pursuant to regulations prescribed by the President.

The VA argues that it is required to pay for covered transportation expenses because the word "may" in §§ 610 and 612 should be read to be mandatory. In the VA's view, §§ 610 and 612 require the Administrator to provide hospital care, domiciliary care, and medical services to eligible veterans, "within the limits of Veterans' Administration facilities." Because the terms hospital care, domiciliary care, and medical services are defined in § 601 to include transportation, transportation is an "integral part" of medical care, according to the VA. Thus, the argument continues, once a person is determined to be eligible for one of these benefits, that person is automatically eligible for and must also be afforded transportation. The VA recognizes that the clause "within the limits of Veterans' Administration facilities" gives it some discretion to set *priorities* for access to VA facilities among classes of veterans when facilities are limited. In its view,

---

[5] Medical services may also be provided to veterans if such services are in preparation to, would obviate the need for, or are necessary to complete treatment incidental to, hospital care covered under § 610; if the veteran has a service-connected disability rating of 50 percent or more, if the veteran is a former prisoner of war; if the veteran was discharged from active service for a disability incurred or aggravated in the line of duty; or if the veteran meets certain other selected criteria. *See* § 612(a), (f), and (g).

however, it is required to reimburse covered transportation costs whenever veterans receive care covered by the VA, unless such reimbursement is specifically precluded by § 111.

OMB, on the other hand, contends that the definitions of the medical benefits described in § 601 specifically make the transportation component subject to the provisions of § 111, which states that the Administrator "may" pay for certain travel expenses. The plain meaning of the word "may," according to OMB, is that the Administrator has discretion; OMB emphasizes that this construction is supported by the fact that subdivision (e) of § 111 uses the word "shall" to require the Administrator of the VA to conduct specified studies and surveys of travel costs and to report them to Congress. The VA answers this argument by contending that § 111 should be read as merely adding discretion as to the alternative modes of calculating reimbursement mandated under §§ 610 and 612, and not as providing discretion to refuse to reimburse transportation costs on some basis.[6]

In resolving this dispute, we begin by observing that the use of the word "may" in all of these provisions clearly supports OMB's conclusion that reimbursement of transportation costs is permissive. A statute's terms are normally to be interpreted in light of the usual or customary meaning of the words themselves. *See, e.g., Southeastern Community College* v. *Davis,* 442 U.S. 397, 405–406 (1979). The word "may" ordinarily indicates that one has permission or liberty to do something, not that one is required or compelled to do something. *See Webster's Third New International Dictionary,* 1396 (1976). Absent some compelling evidence of a contrary intent, the courts have interpreted the word "may" as used in a statute to be permissive. *See, e.g., Anderson* v. *Yungkau,* 329 U.S. 482 (1947); *Farmers & Merchants Bank* v. *Federal Reserve Bank,* 262 U.S. 649, 662–63 (1923) (Brandeis, J.); *Burglin* v. *Morton,* 527 F.2d 486, 488 (9th Cir. 1975), *cert. denied,* 42 U.S. 973 (1976); *United States* v. *Bowden,* 182 F.2d 251, 252 (10th Cir. 1950). This interpretation is buttressed in the case of veterans' medical benefits by the fact that § 111(e)(1), (3), and (4) provides that the Administrator "shall" conduct an annual study on travel costs and "shall" submit a report to Congress on the rate he proposes to set for reimbursement. Similarly, § 612(h) and (i) provides that the Administrator "shall" furnish certain medicinal drugs to eligible beneficiaries and "shall" establish an order of priority for access to medical services. Finally, in §§ 511–562, Congress used the term "shall" in describing the Administrator's obligation to pay veterans' pensions. This contrast in the use of terms suggests strongly that when Congress wanted to impose a mandatory requirement in this title—indeed, in two of the very provisions at

---

[6] Although we believe this description of the VA's position is accurate, the VA's interpretation of § 111 over the years has been somewhat strained, if not inconsistent In an August 23, 1960, opinion attached to the VA Memorandum, the VA found that § 111 not only furnished independent authority for reimbursement of certain transportation expenses that were not covered in §§ 612 or 610 at that time, but also mandated reimbursement of those expenses. In a June 30, 1976, opinion also attached to the VA Memorandum, however, the VA found that it had greater discretion in reimbursing transportation independently authorized under § 111 than transportation authorized under § 610, although it did not specify the limits of that discretion Thus, according to the VA, the word "may" as used in § 111 is mandatory with respect to certain types of transportation, but provides some discretion with respect to others

issue—it knew how to do so. *See Anderson* v. *Yungkau,* 329 U.S. at 485 (when "may" and "shall" used in the same provision, "normal inference is that each is used in its usual sense"); *Farmers & Merchants Bank* v. *Federal Reserve Bank,* 262 U.S. at 662–63.[7]

In addition, §§ 610 and 612 provide that care "may" only be provided "within the limits of Veterans' Administration facilities." Thus, in contrast to the sections imposing an unqualified obligation on the Administrator to pay pensions, *see, e.g.,* §§ 511, 512, 521 ("Administrator shall pay . . . ."), §§ 610 and 612 expressly state that the Administrator need not deliver care to the extent that the VA does not have adequate facilities. Put another way, Congress has no legal obligation under these provisions to appropriate sufficient money to ensure that facilities exist so that every veteran made eligible under these statutes may obtain services. In the absence of adequate facilities, moreover, the Administrator is free to choose between categories of beneficiaries in rationing the use of scarce facilities. Thus, these provisions clearly do not require that all eligible veterans receive medical benefits and, on the other hand, give the Administrator wide discretion in allocating resources. All things being equal, this limitation suggests that the word "may" was used in its ordinary permissive sense—to grant the Administrator discretion to balance the provision of the various types of care.

The only federal court which, to our knowledge, has addressed the question of what Congress intended when it used the language of the provisions under discussion in this memorandum has found that § 610 does not require the Administrator to provide domiciliary care to veterans. In *Moore* v. *Johnson,* 582 F.2d 1228, 1233 (9th Cir. 1978), the court dismissed an action brought under 28 U.S.C. § 1361 to require the Administrator to place certain veterans' beneficiaries in specific domiciliary facilities, reasoning that "the benefits made available by 38 U.S.C. § 610, being such as the Administrator 'may furnish' and 'within the limits of Veterans Administration facilities,' are thus committed to agency discretion by law."[8]

In light of the plain meaning of the language of these provisions, we must act

---

[7] The VA Memorandum places some significance on the fact that § 111(e)(2)(A) makes persons receiving or eligible to receive a VA pension, or with an income below that provided by a VA pension, automatically eligible for reimbursement of transportation expenses, even though they may otherwise be able to "defray" the expense of such travel according to the regulations promulgated by the Administrator. The VA draws the inference from this that "[t]his section now directs the Administrator to prescribe regulations to limit payment in some case[s] to assure a real inability to pay for the necessary travel, while making it clear that *the authority to so limit does not apply with respect to certain other categories of individuals.*" VA Memorandum at 5 (emphasis added) Subsection (e)(2), however, merely establishes various restrictions on the Administrator's authority to provide travel reimbursement ("In no event shall payment be provided under this section . . ."). Subparagraph A, which sets forth the basic restriction that a person seeking reimbursement must demonstrate an inability to defray the expenses before the Administrator is authorized to afford such reimbursement, specifically exempts from this mandatory means test veterans "receiving benefits for or in connection with a service-connected disability" or who fall into the other categories noted above. Thus, by operation of the statutory double negative, placing veterans in these exempted categories merely puts them back in the basic posture of being subject to whatever discretion the Administrator may have under the term "may."

[8] In contrast, the Supreme Court, *see Reynolds* v. *United States,* 292 U S. 443, 446 (1934), the lower federal courts, *see United States* v *St Paul Mercury Indemnity Co.,* 238 F 2d 594, 596 (8th Cir. 1956); *United States* v. *Alperstein,* 183 F. Supp. 548, 550 (S D Fla 1960), *aff'd,* 291 F.2d 455 (5th Cir. 1961); *United States* v. *Petrik,* 154 F Supp. 598, 599 (D Kan 1956); and the Attorney General, *see* 37 Op Att'y Gen. 551, 557 (1934), have interpreted the word "shall" in predecessor statutes on veterans' medical benefits to be mandatory The distinction between the use of the word "may" and "shall" is discussed *infra.*

729

within certain well-defined constraints. If a legislative purpose [of a statute] is expressed in "plain and unambiguous language, . . . the . . . duty of the courts is to give effect according to its terms." Exceptions to clearly delineated statutes will be implied only where essential to prevent "absurd results" or consequences obviously at variance with the policy of the enactment as a whole.

*United States* v. *Rutherford,* 442 U.S. 544, 551–52 (1979) (citations omitted) (quoting *United States* v. *Lexington Mill & Elevator Co.,* 232 U.S. 399, 409 (1914)). Thus, §§ 111, 610, and 612 should be interpreted as permissive unless the legislative history reveals that such an interpretation would lead to "'absurd results' or consequences obviously at variance with the policy of the enactment as a whole." *Id.*

## II. Legislative History

The current statutory scheme was essentially established in the Veterans' Benefits Act of 1957, Pub. L. No. 85–56, 71 Stat. 83, 110 (1957) (1957 Act). Although subsequent amendments added new types of covered care and new categories of eligible veterans, and made certain structural changes discussed below, this Act first adopted the word "may" in 38 U.S.C. §§ 2510 and 2512 (1952) (Supp. V), which were recodified the next year as §§ 610 and 612. *See* Pub. L. No. 85–857, §§ 610, 612, 72 Stat. 1105, 1141–42 (1958). Unfortunately, the legislative history of the 1957 Act itself is not helpful in determining what Congress intended when it adopted this language. Except for certain minor changes not pertinent to this memorandum, the 1957 Act was passed, according to the committee reports and repeated floor comments, merely to incorporate, recodify and simplify existing laws, and not to change the substance of veterans' benefits.[9] There was no specific discussion as to why the word "may" was adopted or whether medical care or transportation was intended to be mandatory or permissive. In addition, the 1957 Act had substantively different provisions on medical benefits than the laws it replaced, which mandated the delivery of certain types of services and only authorized the delivery of others. Thus, in understanding what Congress intended when it passed the 1957 Act with regard to travel expense reimbursement, we must review in detail the history of the veterans laws leading up to 1957 and attempt to assess from this general history what Congress intended when it passed the 1957 Act.

---

[9] *See* Letter from Comptroller General to Chairman, Committee on House Affairs, B–124054 (Jan 30, 1957), H.R. Rep. No 279, 85th Cong., 1st Sess. 2 (1957) ("bill . . . does not adversely affect the basic entitlement of any veteran or dependent presently on the compensation or pension rolls, nor does it liberalize, except in very minor areas, the provisions of law which govern the eligibility of veterans and their dependents for such benefits"); 103 Cong. Rec. 4915 (1957) (remarks of Rep. Teague) (stating that "[t]here is no intent on the part of the committee to incorporate changes other than on the basis indicated" and not indicating any intent to change the substantive right to medical benefits); 103 Cong. Rec. 4916 (1957) (remarks of Rep. Adair) (bill is not "designed particularly to change the substance of these laws but merely to put them in better form"); 103 Cong Rec 8176 (1957) (remarks of Sen. Byrd) ("bill contains only a few minor substantive changes in the existing law, generally of a minor liberalization . . .").

## A. *Status of Law Before Passage of 1957 Act*

During the period between 1917—when the first act dealing purely with veterans' medical benefits was passed—and 1957—when the various existing veterans' benefit laws were incorporated and simplified—Congress passed numerous laws mandating medical benefits for some veterans and authorizing care for others. Originally, under the 1917 Act, the provision of medical benefits was clearly mandated for all groups covered by the law at that time. The 1917 Act provided that medical and hospital services "shall be furnished" to World War I veterans with service-connected injuries. *See* Pub. L. No. 65–90, § 302(g)(3), 40 Stat. 398, 406 (1917). In 1922, these mandatory services, which included transportation, were expanded to include hospital care for neuropsychiatric or tubercular diseases of veterans of the Spanish American War, the Philippine Insurrection, and the Boxer Rebellion. Pub. L. No. 76–194, § 4, 42 Stat. 496, 497 (1922).

In 1924, however, Congress passed the World War Veterans' Act, which generally continued the mandatory category, but *authorized* the Veterans' Bureau (the predecessor to the VA) to provide hospital care, insofar as "existing Government facilities permit," to veterans of any war, military occupation, or military expedition since 1897, with preference to be given to those unable to defray the expense. *See* Pub. L. No. 86–242, § 202(e)(10), 43 Stat. 607, 620–21 (1924). According to a subsequent report prepared by the General Counsel's Office of the VA reviewing the legal developments during this period:

> The passage of the World War Veterans' Act in 1924 brought about a complete change of policy with regard to the construction of additional hospital facilities. A large influx of veterans of all types into Government institutions taxed the capacity of existing facilities. It then became necessary to plan a program of construction which would eventually take care of the men and women needing hospitalization or domiciliary care from a veteran population of over 5 million. Notwithstanding that the Congress during the next 7 years authorized and appropriated the sum of $68,677,000 for new hospital construction, the demand for beds from veterans with non-service-connected disabilities exceeded the number of beds available.

*Legislative Background of Hospitalization for Non-Service-Connected Disabilities*, prepared by General Counsel's Office, VA, October 1, 1956, *reprinted in Hearings Before House Committee on Veterans' Affairs*, July 16, 1958, p. 4022 (VA Legislative Background Study). Because the delivery of care to the new groups covered by the 1924 Act was discretionary, and was to be provided only when "existing Government facilities permit," the decision on the level of services to be provided was made essentially through the congressional appropriations process, where funding levels were set for construction of new VA facilities. *See* VA Legislative Background Study, pp. 4022–24.

731

With the onset of the Depression, Congress passed the so-called Economy Act, Pub. L. No. 73–2, § 6, 48 Stat. 8, 9 (1933), which repealed prior medical care acts and made the provision of *all* medical care by the Administrator permissive. This basic act, which remained in effect with certain amendments until 1957, "authorize[d]" the Administrator, "under such limitations as may be prescribed by the President, and within the limits of existing Veterans' Administration facilities, to furnish the men discharged . . . for disabilities incurred in [the] line of duty and to veterans of any war . . . domiciliary care where they are suffering with permanent disabilities, tuberculosis or neuropsychiatric ailments and medical and hospital treatment for diseases or injuries." Pub. L. No. 73–2, § 6, 48 Stat. 8, 9 (1933) *as amended by* Pub. L. No. 73–78, 48 Stat. 283, 301–302 (1933). In explaining the reasons for this new grant of discretionary authority, a subsequent report prepared by the Solicitor of the VA and presented to Congress reviewed the reasons for the Economy Act's passage:

> It was not until 1930 when the Veterans' Administration was created, and all agencies dealing with veterans' relief consolidated therein that the glaring discrepancies and injustices existing in these laws became apparent. Following this, the Congress, recognizing the need for remedial action, appointed a joint committee of the Senate and the House to study the question. This committee went deeply into the question of veterans' relief, and was in the process of formulating a report, but before a final report was made the President presented his program of economy with reference to veterans' benefits which was enacted into law.

*     *     *     *     *

> It was apparent that in order to insure elimination of inequalities and injustices revealed by the exhaustive studies and reports the program should call for legislation expressing the broad principles governing the relief to veterans and the limits within which benefits could be administered, *leaving the details to the President*. This program insured immediate action by the Congress and as subsequently revealed by veterans' regulations the program within the limits prescribed by Congress has been effectuated in such manner that the desired results have been realized within the minimum length of time and with the establishment of an acceptable system of administration.

> That the method suggested by the President was the only method which could be expected to attain results must be conceded by all who are familiar with the subject. While the Congress had recognized the evils of the existing situation it became early apparent during the deliberations of the joint committee that there was no unanimity of opinion as to what should be done. One member or

group of members believed that this or that should be done, but the other should not be done. Other members believed that other different benefits were the ones which should be changed. *It was only by placing the authority in the President to make corrections relying on his fairness of mind and courage to tackle the problem and solve it that definite accomplishment could be realized.*

*Comparative Study of Veterans' Legislation,* prepared by Solicitor, VA, *reprinted in* 78 Cong. Rec. 2550, 2554 (1934) (emphasis added).

The President promulgated several veterans' regulations under the Economy Act, which, under the terms of the Economy Act, Pub. L. No. 73–2, § 19, 48 Stat. 8, 12 (1933), could not be amended by the President after March 20, 1935, two years after the Economy Act's enactment.[10] These regulations authorized the Administrator to establish a complicated priority system for hospital and domiciliary care with service-connected care generally having a higher priority than non-service-connected care. *See* VA Regulation 6(a), *reprinted in* notes to 38 U.S.C. § 739 (1946). The presidential regulations also stated that the Administrator "may" provide certain medical services, although no system of priority was established for these services. *See* VA Regulation 7(a), *reprinted in* notes to 38 U.S.C. § 739 (1946). Finally, the regulations provided that the Administrator "may" "in his discretion" reimburse transportation expenses of those beneficiaries traveling to receive VA covered care. *See* Executive Order No. 6094, section III (March 31, 1933); Executive Order No. 6232, section III (July 28, 1933); Executive Order No. 6566, paragraph 2 (Jan. 19, 1934).

Soon after the passage of the Economy Act, Congress became disturbed over the VA's failure to use all available beds in VA hospitals, *see* 78 Cong. Rec. 3288–89 (1934) (remarks of Sen. Steiwer), and added a new clause to § 706 specifically *requiring* the Administrator to pay for hospital and domiciliary care (including transportation) for veterans of any war who were unable to defray the expense of their care or transportation. This provision stated in full:

> That any veteran of any war who was not dishonorably discharged, suffering from disability, disease, or defect, who is in need of hospitalization or domiciliary care, and is unable to defray the necessary expenses therefor (including transportation to and from the Veterans' Administration facility), *shall* be furnished necessary hospitalization or domiciliary care *(including transportation)* in any Veterans' Administration facility, within the limitations existing in such facilities, irrespective of whether the disability, disease, or defect was due to service. The statement under oath of the applicant on such form as may be prescribed by the Administrator of Veterans' Affairs shall be accepted as sufficient evidence of inability to defray necessary expenses.

---

[10] We have not examined the constitutional implications of such a process.

Pub. L. No. 73–141, § 29, 48 Stat. 509, 525 (1934) (emphasis added). Unlike the Economy Act which only gave the Administrator "permissive authority" to provide care, this amendment, as its author noted, was "mandatory in its requirement" with respect to war veterans when available hospital and domiciliary facilities existed. 78 Cong. Rec. 3288–89 (1934) (remarks of Sen. Steiwer).[11] The courts which interpreted this section uniformly found that, by using the word "shall," it required the Administrator to provide hospital care for needy war veterans under the specified circumstances. *See United States v. St. Paul Mercury Indemnity Co.*, 238 F.2d 594, 596 (8th Cir. 1956); *United States v. Alperstein*, 183 F. Supp. 548, 550 (S.D. Fla. 1960), *aff'd*, 291 F.2d 455 (5th Cir. 1961); *United States v. Petrik*, 154 F. Supp. 598, 599 (D. Kan. 1956). The Attorney General reached the same conclusion in an opinion for the President in 1934. *See* 37 Op. Att'y Gen. 551, 557 (1934). Apparently in response to the 1934 amendment, the President amended the presidential regulation on veterans' benefits to provide that transportation "will" be provided for persons traveling to and from a VA facility for hospital or domiciliary care if they were unable to defray the necessary expense. *See* Executive Order No. 6775, paragraph 2 (June 30, 1934).

Despite its mandatory language, however, the 1934 amendment does not appear to have required the Administrator to change his system of priority for access to VA care. Under that system, care for service-connected disabilities was given priority over non-service-connected care, even though veterans with service-connected disabilities might be able to defray the cost of their care, and veterans with non-service-connected medical problems might not. The author of the amendment stated that the purpose of the amendment was to ensure that excess beds in VA hospitals did not remain vacant while indigent veterans could not obtain medical care. He expressed no intent to end the system of priority to medical care that had generally given veterans with service-connected injuries first calling on VA medical care since 1917. *See* note 11, *supra*. The Executive Branch apparently adopted this interpretation of the amendment, for the President retained the system of priority to care established under the presidential regulations, *see* VA Regulation 6(a), *reprinted in* notes to 38 U.S.C. § 739 (1946), and the Attorney General did not find the system to be inconsistent with the requirements of the amendment. *See* 37 Op. Att'y Gen. 551 (1934). Indeed, congressional committees overseeing the operations of the VA during this period explicitly approved of the system of priority established by the President. *See* VA

---

[11] The Senator also noted:

It occurs to us that there is no objection at all to making mandatory the furnishing of hospital treatment within the limitations of existing facilities when the United States has the facilities and the personnel to furnish the service and when there are indigent sick veterans unable to care for themselves, who, if they are not cared for through the agencies of the United States Government, must be cared for by charity in private hospitals or in State and other local institutions.

We hope that the Senate will take favorable action so as to make mandatory the use of these vacant beds. There are now some 7,000 vacant beds in these facilities Prior to the liberalization of Veterans' Administration policy and to the use of the facilities for the C.C.C. and other Federal agencies, there were nearly 13,000 vacant beds, made vacant by the drastic restrictions under the Economy Act. The object of this proposal is to bring about the utilization in behalf of sick and indigent soldiers of these available unused facilities.

78 Cong. Rec. 3289 (1934)

Legislative Background Study at 4029–31. Thus, the 1934 amendment does not appear to have limited the ability of the Administrator to give those needing service-connected care first access to VA facilities.

The final statute passed prior to the adoption of the 1957 Act was a predecessor provision of § 111, and was principally intended to permit the Administrator to substitute a mileage allowance for reimbursement of actual costs. The Comptroller General found in a 1938 opinion solicited by the VA that the VA did not have the authority to substitute a mileage allowance for repayment of actual costs for beneficiary travel. See Comp. Gen. Op. A–98336 (Oct. 11, 1938). The Administrator sought[12] and obtained passage of this provision to give him that authority. See 38 U.S.C. § 76 (1946).[13]

Thus, in 1957, the statutory framework can be summarized as follows: The Administrator was authorized to provide hospital care, domiciliary care, and medical services for any veteran. When extra beds were available in VA hospitals or domiciliary facilities, the Administrator was required, after care had been provided for service-connected disabilities, to use the remaining facilities to provide care for war veterans unable to defray the necessary expenses. Finally, when the Administrator did provide hospital or domiciliary care, he was required to reimburse the transportation expenses of those unable themselves to defray such expenses.

## B. 1957 Act

With the passage of the 1957 Act the veterans' provisions in Title 38 were recodified and §§ 76 and 706 were replaced with new §§ 2510, 2512, and 2121 adopting the permissive language now used in §§ 610, 612, and 111, respectively. See Pub. L. No. 85–56, §§ 510, 512, 2101, 71 Stat. 83, 111, 112, 154–55 (1957). Although the legislative history of the Act clearly demonstrates, as we noted above, that Congress did not intend to make any substantive changes in the provision of veterans' benefits, except for several explicit changes not relevant here,[14] the recodification eliminated the word "shall," but retained the permissive tone of the original portion of § 706. The new provisions—§§ 2510, 2512, 2121—stated that the Administrator "may" furnish hospital care, domiciliary care, medical services, and transportation payments to the same groups of veterans to which he had previously been required to provide care and transportation under § 706. Thus, Congress used the term "may" in the new statute to cover the care of groups to which the Administrator clearly had previously been required to provide care, as well as to the groups to which he clearly had not been

---

[12] See S. Rep No. 920, 76th Cong., 1st Sess. 2 (1939) (quoting VA Administrator's statement that bill "has been prepared with a view of securing authorization to provide by regulation for an allowance on a mileage basis in lieu of expense of such travel including necessary expense for mea[l]s and lodging") See also H R Rep No 1579, 76th Cong , 3d Sess. 1–3 (1940).

[13] Pub L. No 76–432, 54 Stat. 49 (1940). The Act also provided that payment of mileage allowance could be made before completion of travel and that "when any such person requires an attendant other than an employee of the Veterans' Administration for the performance of such travel, such attendant may be allowed expenses of travel upon a similar basis." Id at 50.

[14] See note 9, supra

735

required to provide care. The basic language of § 76, which stated that the Administrator "may" pay the actual costs or per mile costs of veterans traveling for examination or care, was also incorporated in a new § 2121.

Congress' intent in using the word "may" in the 1957 Act is certainly not self-evident. Each alternative interpretation of this language finds some element of the legislative history or statutory language which arguably does not support it. In light of this ambiguity, however, the legislative history, in our view, is not sufficiently compelling to contradict the plain language of the statute, and, indeed, can be read generally to support a permissive interpretation.

First, the legislative history of all of these provisions reflects one overwhelming fact—the Administrator must have wide discretion to set priorities and balance resources in the provision of medical benefits for veterans. Since the passage of the World War Veterans Act in 1924, veterans' facilities and resources have never matched the needs of all of those who were eligible for care, thereby necessitating that the delivery of care would be largely discretionary.[15] This need for administrative discretion is also reflected in the ubiquitous provision that care can only be supplied "within the limits of Veterans' Administration facilities." Although Congress did limit this administrative discretion somewhat by passing the 1934 amendment to the Economy Act, the amendment appears to have been intended merely to ensure that excess VA beds were used, and not to limit the Administrator's overall authority to balance resources and priorities for care. In light of this history of general administrative discretion, it is reasonable to assume that, by using the word "may" in the 1957 Act, Congress intended to permit the Administrator to engage in a general balancing of resources with respect to medical and transportation expenses.

Second, Congress' announced intention in passing the 1957 Act—not to alter the substantive provisions on veterans' benefits—cannot be taken at face value. Despite the general statement of purpose, the text of the 1957 Act clearly reveals that Congress not only removed the mandatory language in § 706, but also terminated the eligibility for certain categories of veterans. For example, § 706 had given the Administrator the authority to cover hospital and domiciliary care for non-service-connected injuries, even though the veterans had the money to defray the expense. *See also* VA Regulation 6(a)(I)(f), *reprinted in* notes to 38 U.S.C. § 739 (1946). Section 2510 (renumbered to current § 610 by the 1957 Act), however, limited coverage to those who were receiving service-connected care or who were unable to defray the medical expense.

Third, Congress must be charged with knowledge that, by removing the mandatory language in § 706 and adopting the permissive word "may" in §§ 2510 and 2512, these provisions were susceptible to the natural interpretation of the term to give the Administrator permissive authority. Before the 1957 codification, Congress had expressly distinguished in § 706 between the mandatory use of the word "shall," as adopted in the 1934 amendment, and the

---

[15] A similar system of priority to medical services was statutorily mandated in 1976 amendments to § 612. *See* Pub. L. No. 94–581, § 103(a)(8), 90 Stat. 2842, 2845 (1976)

permissive language in the Economy Act—a distinction which was recognized by the courts and the Attorney General. The President had also amended the presidential veterans' regulations on transportation from "may" to "will" apparently in response to this change. *Id.* Thus, when Congress chose to delete the word "shall" in 1957 and employ the permissive term "may," Congress must be presumed to have understood the significance of its choice of terms. *See* 2A, C. Sands, Sutherland Statutory Construction § 51.02 ("if words used in a prior statute to express a certain meaning are omitted, it will be presumed that a change of meaning was intended") (footnote omitted).

Finally, to interpret these provisions to require the Administrator to reimburse the covered transportation costs of eligible beneficiaries would lead to an unlikely result. If the Administrator lacks the facilities to provide all the care specified in the statute, a situation which the legislative history reveals to be the usual circumstance, he has explicit authority, by virtue of the clause "within the limits of Veterans' Administration facilities," to allocate resources between classes of veterans. An interpretation that the Administrator is required to make transportation payments to beneficiaries traveling to receive medical benefits, however, would protect transportation services at the expense of medical services, hospital care, and domiciliary care. In a situation where the Administrator lacks sufficient funds to cover all medical and transportation services, he would be required to reduce hospital care, domiciliary care, and medical services to a level that would ensure that persons receiving medical benefits received all covered transportation reimbursement. Thus, conceivably, this interpretation would require the Administrator to deny medical benefits to some eligible veterans in order to provide medical benefits *and* transportation benefits to a smaller number of eligible veterans.

Thus, while the issue is not free from doubt, the legislative history surrounding Congress' adoption of the permissive language now contained in §§ 610 and 612 generally supports the conclusion that Congress did not intend to require the Administrator to reimburse all transportation costs of VA beneficiaries traveling to receive covered care. Certainly, nothing in the legislative history suggests that an interpretation of these provisions as discretionary leads to "'absurd results' or consequences obviously at variance with the policy of the enactment as a whole." *United States* v. *Rutherford,* 442 U.S. 544, 552 (1979) (citations omitted).

### III. Legislative Ratification

Having concluded that the legislative history prior to 1957 does not rebut the plain meaning of the language of these provisions, we still must explore the VA's argument that the VA has consistently interpreted the relevant provisions since 1957 to mandate travel reimbursement and that Congress has been fully aware of this view. Although not stated explicitly, the VA is apparently suggesting that Congress has ratified the VA's interpretation.

## A. Requirements for Finding a Legislative Ratification

Legislative ratification has generally served as a device for resolving ambiguities in statutory language. The principle is an outgrowth of the related concept that the well-reasoned interpretation of a statute by the agency charged with its enforcement is entitled to great deference. *See, e.g., Red Lion Broadcasting Co. v. Federal Communications Commission,* 395 U.S. 367, 381 (1969); *Udall v. Tallman,* 380 U.S. 1, 16 (1965). When the agency's interpretation of a statute has been publicly conveyed to members and committees of Congress, *see, e.g., Haig v. Agee,* 453 U.S. 280, 299 (1981); *Securities and Exchange Commission v. Sloan,* 436 U.S. 103, 121 (1978); *Zuber v. Allen,* 396 U.S. 168, 193–94 (1969), and Congress has failed to challenge the agency's position in circumstances suggesting adoption of it, *see, e.g., Haig v. Agee,* 453 U.S. at 300–301; *Red Lion Broadcasting Co. v. Federal Communications Commission,* 395 U.S. at 381–82; *Zemel v. Rusk,* 381 U.S. 1, 11–12 (1965), the courts have "held [the legislative acquiescence] to constitute persuasive evidence that that interpretation is the one intended by Congress." *Zemel v. Rusk,* 381 U.S. at 11 (footnote omitted).

In light of the foregoing principles, those attempting to establish a congressional ratification of the administrative construction of the veterans' benefit provisions with respect to beneficiary travel carry a heavy burden. First, the language of the relevant provisions is not facially ambiguous. The Supreme Court has ordinarily found a legislative ratification of an administrative interpretation only where the agency has construed an ambiguous statute. *See Securities and Exchange Commission v. Sloan,* 436 U.S. at 121. Generally speaking, "administrative practice does not avail to overcome a statute so plain in its commands as to leave nothing for construction." *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315 (1933) (Cardozo, J.). *See F.M.C. v. Seatrain Lines,* 411 U.S. 726, 745 (1973); *United States v. Southern Ute Indians,* 402 U.S. 159, 173 n.8 (1971); *Estate of Sanford v. Commissioner of Internal Revenue,* 308 U.S. 39, 52 (1939). Although we would not exclude the possibility that Congress could ratify an interpretation contrary to the ordinary meaning of a statute, *cf. Saxbe v. Bustos,* 419 U.S. 65, 74 (1974); *United States v. Midwest Oil Co.,* 236 U.S. 459 (1915), we believe the burden upon those seeking to demonstrate Congress' ratification in such a circumstance is demonstrably greater.

Second, the Administrator's longstanding practice of reimbursing such costs is consistent with either interpretation of the statute, namely, that he is required to reimburse transportation costs *or* that he has authority to terminate such payments, but has simply chosen not to exercise his discretion to do so. Thus, this situation is distinguishable from the facts of most ratification cases where the actions of the agency are *in*consistent with the alternative construction and thus can be said to put Congress on notice that it must challenge the agency's view and amend the statute if it disagrees with the agency's interpretation. *See, e.g., Red Lion Broadcasting Co. v. Federal Communciations Commission,* 395 U.S. at 377–379; *Zemel v. Rusk,* 381 U.S. at 10–11; *Kent v. Dulles,* 357 U.S. 116,

127–128 (1958). *But cf. Haig* v. *Agee*, 453 U.S. at 302–303. Congress' failure to challenge the administrative construction in the present situation, therefore, might not evidence an acceptance of the Administrator's legal position, but merely of the policy decision to reimburse transportation costs.

Finally, the decisions of the VA which Congress has supposedly ratified do not provide a detailed, persuasive legal analysis of the relevant statutes. The general doctrine deferring to the interpretation of a statute by an administrative agency has far less application where the decisions of the agency lack "specific attention to the statutory authorization," or evidence a lack of "thoroughness . . . in its consideration" or "validity of its reasoning." *Adamo Wrecking Co.* v. *United States*, 434 U.S. 275, 287 n. 5 (1978). *See Securities and Exchange Commission* v. *Sloan*, 436 U.S. at 117–18. With respect to the reimbursement of travel expenses, the VA originally found in a 1960 opinion that it was required to cover costs for certain veterans because the word "may" in § 111 should be interpreted as mandatory. *See* Opinion of General Counsel, VA, Aug. 23, 1960. This conclusion was based not on an analysis of the legislative history of this provision, but rather on the fact that the VA itself had previously interpreted one of its *own regulations* using the word "may" to be mandatory. *Id.* at 2. The General Counsel also relied in the 1960 opinion on the fact that Congress had, in extending medical services to such veterans in a 1960 amendment, included a cost estimate of transportation for those obtaining medical services. The opinion apparently reasons, in a logical *non sequitur*, that Congress thereby intended to *require* transportation costs be covered. Based on the analysis of this 1960 decision, the VA has held in later opinions that transportation costs must be reimbursed. *See* Opinion of General Counsel, VA, June 30, 1976; Opinion of General Counsel, VA, Dec. 12, 1980. This line of decisions hardly constitutes, in our view, the type of attention to statutory authorization and exercise of administrative expertise which normally has provided the basis for judicial deference to an agency's interpretation and a finding of congressional ratification of that construction. While we do not exclude the possibility that Congress could ratify an administrative interpretation under such circumstances, we believe, in light of the clarity of the statute and the lack of clarity in the VA decisions, that, to constitute ratification of such a construction, Congress' acceptance of the administrative position must, at a minimum, be clear and unambiguous.

## B. Congressional Response to VA's Statutory Construction

Although all of these provisions have been amended numerous times during the period after 1957, on only three occasions, in 1976, 1979, and 1980, when amendments were made to § 111, has the authority of the Administrator to cut transportation payments arguably been at issue. Bearing in mind the heavy burden upon those claiming that Congress has ratified the administrative interpretation in this case, we do not believe that the history of any of these amendments reflects sufficient evidence of a congressional adoption of the VA's construction.

(i) 1976 Amendment. The first amendment, which was passed in 1976, does not raise a serious question of legislative ratification, and thus we deal with it only briefly here. The 1976 amendment made three changes with respect to beneficiary travel reimbursement. First, it amended § 601 to incorporate, for the first time, the requirements of § 111 in the definitions of hospital care, domiciliary care, and medical services. *See* Pub. L. No. 94–581, §§ 102, 202(b), 90 Stat. at 2843–44, 2855. Previously, the definition of hospital and domiciliary care in § 601 had merely stated that such care included specified transportation costs, and the definition of medical services had not included any specific reference to transportation reimbursement. *See* 38 U.S.C. § 601 (1970). Second, the 1976 Act amended § 111 to permit the Administrator to require the beneficiary to submit an annual declaration and certification of his inability to defray travel expenses in order to ensure that reimbursement for travel costs was not paid to ineligible veterans. *See* Pub. L. No. 94–581, § 101, 90 Stat. at 2842. Finally, the 1976 Act added the provision that the Administrator "shall" conduct an annual study of the costs of travel and "shall" set the rates of reimbursement based on this study. *See id.* at 2842–43.

Neither the language nor the legislative history of this Act, which was generally passed in order to reduce the cost of beneficiary travel, *see* S. Rep. No. 1206, 94th Cong., 2d Sess. 56–57, 71, 76–77 (1976), evidence any belief by Members of Congress that the Administrator did not have discretion in reimbursing the travel costs of eligible beneficiaries. To the contrary, although Congress did not specifically consider whether the Administrator could eliminate travel reimbursement, the fact that it chose to use the word "shall" rather than "may" in amending § 111 suggests that it understood "may" was used in its permissive sense elsewhere in § 111. Moreover, as the floor comments on these amendments emphasize, these changes were not intended to eliminate the "Administrator's present authority to change the rate" of reimbursement for transportation. 121 Cong. Rec. 40629 (1975) (remarks of Rep. O'Brien). *See also id.* (remarks of Rep. Teague) (bill "does not take away the Administrator's right or responsibility to change the rate"). Thus, the adoption of this amendment suggests, if anything, that the Administrator has broad discretion in allocating funds to beneficiary travel.

(ii) 1980 Amendment. The 1980 amendment also does not raise a serious question of legislative ratification. This amendment was passed in response to the Carter Administration's initial attempt to eliminate reimbursement for beneficiary travel under the authority of the Appropriations Act of 1980, Pub. L. No. 96–86, § 112, 93 Stat. 656, 661 (1979). The Appropriations Act put a cap on the total amount of funds which could be obligated for travel and transportation "for officers and employees of the executive branch. . . ." OMB initially took the position that the Act limited the funds which could be obligated for VA beneficiary travel, and thus moved to limit beneficiary travel payments. Ultimately, the Administration agreed not to limit expenditures for beneficiary travel as a result of Pub. L. No. 96–86. *See* S. Doc. No. 49, 96th Cong., 2d Sess. 8–9 (1980). In response to the threatened cutback, however, Congress passed an Act which

stated that henceforth "[n]o provision . . . which imposes any restriction or limitation on the availability of funds for the travel and transportation of officers and employees of the executive branch" shall be applicable to veterans obtaining travel expenses under § 111 "unless such provision is expressly made applicable to the travel of such veterans. . . ." Pub. L. No. 96-330, § 406, 94 Stat. 1030, 1052 (1980), *reprinted in* notes to § 111.

Like the 1976 Amendment, the passage of this provision does not clearly constitute an adoption of the Administrator's position on beneficiary travel by Congress. The only question at issue was the Administrator's obligation under the 1980 Appropriations Act or similar acts to reduce the costs of beneficiary travel along with government employee travel. The amendment did not deal with the question of the Administrator's authority to reduce travel costs under § 111.

We recognize and have carefully considered that during the hearings over the proposed cutbacks, two members of the House Committee on Veterans Affairs and the representatives of the VA stated, without analysis, that the Administrator was required to reimburse the covered transportation costs of VA beneficiaries in the absence of the budgetary cap. *See* Letter of Apr. 1, 1980 from Rep. Ray Roberts to James McIntyre, Jr., Director, OMB, *reprinted in Hearings on VA Beneficiary Travel Before the House Subcommittee on Special Investigations of the Committee on Veterans Affairs*, 96th Cong., 2d Sess. 29 (May 21, 1980) (Travel Hearings); Travel Hearings at 1 (remarks of Rep. Mottl); *id.* at 27 (remarks of Dr. Custis); *id.* at 32 (remarks of Mr. Coy). This legal issue, however, was not the focus of the hearing, nor of the subsequent amendment to § 111 dealing with general budget caps on travel expenses. There is no indication, moreover, that Congress as a whole ever considered this issue in passing the amendment. We cannot find a congressional adoption of the Administrator's position "based only upon a few isolated statements in the thousands of pages of legislative documents," especially where that interpretation is "at odds with the language of the section in question and the pattern of the statute as a whole." *Securities and Exchange Commission* v. *Sloan*, 436 U.S. at 121.

(iii) 1979 Amendment. The 1979 amendment to § 111, which gave the Administrator broad authority to determine by regulation whether recipients were able to defray the cost of travel, *see* Pub. L. No. 96–151, 201(a), 93 Stat. 1092, 1093 (1979), raises a more serious question of legislative ratification and thus must be considered in greater detail than the other two changes. In 1979 the Administrator originally proposed that § 111 be amended to abolish reimbursement of transportation for non-service-connected care, except where a special mode of transportation was needed for medical reasons. *See* S. Rep. No. 177, 96th Cong., 1st Sess. 15–16, 52–53 (1979). The Administrator noted in a letter to the Senate that "this proposal will result in significant cost savings to the Government so that limited VA resources may be more effectively utilized . . . ." Letter to Walter Mondale, President, U.S. Senate, from Max Cleland, Administrator, VA, *reprinted in* S. Rep. No. 177, 96th Cong., 1st Sess. 53 (1979). In hearings before the committee, officials of the VA appeared to concede, albeit without any legal analysis, that the VA could not bring about

741

savings in the travel program without the enactment of its proposal. *See Hearings on VA Health Resources and Program Extensions Before the Senate Committee on Veterans Affairs,* 96th Cong., 1st Sess. 64 (1979) (remarks of Dr. Custis, Deputy Chief Medical Director, VA). *Cf. id.* at 70 (enactment of restriction on beneficiary travel would save $39 million dollars).

The position adopted by the Senate Veterans Affairs Committee could be read to suggest that it agreed with this view. The Committee initially opposed these and other cutbacks because "the nearly $100 million that the VA estimated would be saved *if the cost-savings provisions were enacted,* would be subtracted from the already strained VA budget." S. Rep. No. 177, 96th Cong., 1st Sess. 16 (1979) (emphasis added). Subsequently, the Senate Committee agreed to report a modified version of the Administration proposal, which reduced the reimbursement of transportation costs for non-service-connected care, but only *if* the Administration also agreed to use the extra funds reaped from the cost savings for the hiring of additional medical personnel at VA hospitals. *See* S. Rep. No. 177, 96th Cong., 1st Sess. 7 (1979). *See also* 125 Cong. Rec. 15163, 15172, 15175 (1979) (remarks of Sen. Cranston); 125 Cong. Rec. 15167, 15173 (1979) (remarks of Sen. Humphrey). The agreement was necessary, as one Senator noted, because the VA was "prohibited *from enforcing the cost savings unless it also hires the extra medical personnel*" to which it had agreed. 125 Cong. Rec. 15177–78 (1979) (remarks of Sen. Morgan). *See also* 125 Cong. Rec. 34985 (1979) (remarks of Sen. Cranston). The Administrator assented to this bargain because "[e]*nactment* of these provisions *[would] free up resources* to make possible additional VA medical facility staffing . . . ." Letter of June 15, 1979, to Sen. Alan Cranston from Max Cleland, Administrator, VA, *reprinted in* 125 Cong. Rec. 15163 (1979) (emphasis added). By making such an agreement, therefore, it might be argued that the Senate committee *and* the Administrator recognized that the Administrator did not have authority to reap these cost savings by eliminating reimbursement for beneficiary travel without this amendment. Ultimately the Administrator acquiesced and adopted the personnel increases before passage of the amendments, *see* 125 Cong. Rec. 34985 (1979) (remarks of Sen. Cranston), and the Senate and House compromise limited even further the cutbacks on beneficiary travel which had been adopted by the Senate. *See id.* (remarks of Sen. Cranston); *id.* at 34989–90 (Senate-House Report on Compromise).

Although the significance of the 1979 legislative history is not free from doubt, we do not believe that this one brief period of bargaining between the Administrator and the Senate committee constitutes a ratification by Congress of the legal position of the VA with respect to the reimbursement of travel costs. We cannot find in these circumstances sufficient evidence of congressional adoption of the VA's construction of the statutory provisions here in issue. First, there is no indication the Senate as a whole or the House agreed with the position of the Senate committee. Second, the circumstances of the bargaining process suggest that members of the committee may have been motivated more by a desire to secure concessions from the Administrator on staffing levels under circumstances

742

in which they otherwise agreed with the policy of limited travel expenses, than any underlying agreement with his legal position. In this regard, we note that there was no discussion or consideration of the legal basis of the Administrator's supposed obligation to provide transportation payments in the committee report or floor comments. Finally, and most importantly, we are aware of no other occasion where a congressional report has specifically addressed the authority of the Administrator to eliminate reimbursement for beneficiary travel under §§ 111, 610, and 612. In the absence of any sustained and general treatment of this issue or a more specific focus on it, we do not believe that this single period of bargaining between the Administrator and the Senate committee can be said to rebut the plain words of the statute.

Accordingly, in light of the plain language of the statute and the lack of persuasiveness of the Administrator's decisions, we conclude that none of these amendments constitutes a congressional ratification of the VA's legal position.

## IV. Conclusion

In summary, we believe the plain language of §§ 111, 601, 610, and 612 indicates that the Administrator is not required to reimburse the transportation costs of eligible veterans' beneficiaries traveling to obtain medical benefits. We are reluctant to construe a term which provides discretion to an agency as creating a mandatory requirement unless there is reasonably strong and persuasive evidence that Congress intended to limit both the agency's discretion and Congress' discretion in the appropriations process. The legislative history of these provisions, however, although somewhat confused, generally supports a permissive interpretation. The history surrounding Congress' recent amendments to § 111, moreover, does not evidence any general and clear congressional acceptance of the VA's position that such payments are mandatory so as to constitute a congressional ratification of this view. Thus, we agree with OMB that the VA has discretionary authority to determine in what cases it will reimburse the covered transportation expenses of veterans who are eligible to receive such payments under §§ 111, 601, 610, and 612. We emphasize that our conclusion does not require the Administrator of the VA to make any changes in pending policies or practices. We find only that the language of the relevant statutes does not prevent him from doing it.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

743